## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **NATHAN BARBIERI** and **NOLAN RADOMSKI**,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>**THOMAS JEITSCHKO,** Interim Provost and Executive Vice President for Academic Affairs of Michigan State University, in his official capacity; **JUDITH WHIPPLE**, Interim Dean of the Michigan State University Broad College of Business, in her official capacity; **AMY WISNER**, Professor of Marketing at the Michigan State University Broad College of Business, in her official and individual capacities,<br><br>*Defendants.* | **CASE NO. _____**<br><br>**VERIFIED COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     The First Amendment to the United States Constitution guarantees the right to speak and associate freely.

2.     These rights each have a negative corollary. "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). And, "[f]reedom of association therefore plainly presupposes a freedom not to associate." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).

3.     When the government goes from restricting the chosen speech or association of its citizens to compelling them to speak its message or associate with its preferred confederates, "additional damage is done" because "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018).

4.     The same harms occur when the government compels speech through forced financial contributions, since "[c]ompelling a person to subsidize the speech of other private speakers raises similar First Amendment concerns." *Id.*

5.     In this case, officials of Michigan State University ("the University") have perpetrated these exact harms on Plaintiffs and hundreds of other students.

6.     Using her authority under University policies to select "course materials," Defendant Wisner compelled each of her six hundred students to pay a $99 membership fee to join an outside organization called "The Rebellion Community."

7.     Defendant Wisner controlled The Rebellion Community and used the membership fees to finance her own political advocacy and to support external groups—including Planned Parenthood—that engage in political speech that is antithetical to the Plaintiffs' deeply held beliefs.

8.     Plaintiffs bring this Complaint for compensatory and punitive damages and declaratory and injunctive relief in order to halt Defendant Wisner's ongoing use of their funds to advance messages they disagree with and correct the

University's policies that, as applied, permit faculty to force Plaintiffs to finance and associate with external advocacy organizations as a condition of course enrollment at the University.

## JURISDICTION AND VENUE

9.    This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

10.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

11.    This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

12.    Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) and W.D. Mich. LCivR 3.2 because Defendants reside in this district and division and all of the acts described in this Complaint occurred in this district and division.

## PLAINTIFFS

13.    Plaintiff Nathan Barbieri is a sophomore at the University pursuing a major in Finance. Mr. Barbieri resides in East Lansing, Michigan.

14.    Plaintiff Nolan Radomski is a sophomore at the University pursuing a major in Supply Chain Management. Mr. Radomski resides in East Lansing, Michigan.

## DEFENDANTS

15.    Article VIII, Section 5 of the Michigan State Constitution of 1963 vests the Board of Trustees of Michigan State University ("the Board") with authority to oversee the University.

16.    Under its bylaws, "the Board delegates to the President of the University and through the President to the faculty, appropriate authority and jurisdiction over matters for which they are held accountable by the Board."[1]

17.    One of the "faculty" to whom the Board has delegated authority is the Interim Provost, Defendant Jeitschko. Defendant Jeitschko is "[s]ubject to the President and the Board" and is the "principal academic officer of the University."[2]

18.    Defendant Jeitschko is tasked by the Board with the responsibility to "administer the various colleges, special units and academic support facilities" of the University and to "insur[e] that administrative procedures preserve academic freedom and insure academic responsibility."[3]

19.    Defendant Jeitschko personally approved the policy on the donation of proceeds received from assigned course materials at issue in this lawsuit.

20.    Defendant Jeitschko is responsible for "keeping existing programs updated and in conformity with University educational policies" and for

---

[1] Mich. State Univ. Bd. of Trusts., *Bylaws* at 3 (Jan. 10, 2003) available at https://bit.ly/3AxFfDr (accessed May 16, 2023).

[2] *Id.* at 6.

[3] *Id.* at 6–7.

implementing policies on "academic freedom" and "academic responsibility,"
including the policy on selection of course materials at issue in this lawsuit.[4]

21.     Defendant Whipple is the Interim Dean of the Michigan State
University Broad College of Business. Defendant Whipple reports to Defendant
Jeitschko on all matters relating to personnel and academic policy, and has
supervisory authority over all business school faculty, including Defendant
Wisner.

22.     Defendant Whipple is responsible for the implementation of the
policies of the Board within the Michigan State University Broad College of
Business, including the policies at issue on this case.

23.     Defendant Amy Wisner is fixed-term faculty member in the
Department of Marketing at the Michigan State University Broad College of
Business. Defendant Wisner executes her teaching duties under the supervision of
Defendant Whipple and using the authority delegated from the Board "to the
faculty."

## FACTUAL BACKGROUND

**I.     Plaintiffs Barbieri and Radomski wish to obtain an education
without being compelled to support speech opposing their views or
join groups organized to express messages opposing their views.**

24.     Plaintiffs Barbieri and Radomski enrolled at the University to obtain
an education and credentials certifying that education. They are eager to learn
about materials germane to the courses in which they enroll.

---

[4] *Id.* at 7.

25.     Plaintiffs Barbieri and Radomski have deeply-held religious beliefs and views on philosophical, moral, political, and social issues grounded in those beliefs.

26.     While Plaintiffs enjoy testing the mettle of their own views by exploring other ideas and perspectives in the context of their coursework—indeed, they believe this is part of the value of higher education—they do not wish to financially support the speech of others that contradicts their views, and they do not wish to become members of groups organized for the purpose of promoting messages that contradict their views.

27.     In particular, Plaintiffs Barbieri and Radomski are Christians. They believe that each person is created in the image of God and is entitled to dignity and respect by virtue of that reality.

28.     Plaintiffs believe that it is evil to take the life of an innocent person. Consequently, they believe that every innocent life should enjoy the protection of law at all stages, from conception to natural death. They therefore oppose the practices of abortion and euthanasia and they oppose laws permitting those practices.

29.     Plaintiffs also believe that God is the ultimate authority, and that God has established an order of reality that contains moral obligations for human life and conduct. The portion of this order that can be apprehended by human reason is called natural law. The portion of this order that requires special revelation to be understood by human beings is called divine law.

30.     Plaintiffs believe that human liberty consists in submission to the terms of reality, which includes the terms of the natural and divine law. They also believe that obedience to these laws promotes human flourishing, while rebellion against the terms of reality promotes human misery.

31.     Plaintiffs believe that human liberty is *not* primarily about emancipation from all constraint on human identity or expression or from all institutions that precede the individual's consent.

32.     Plaintiffs also believe there are distinctions between a person's moral obligations and their civil obligations. Plaintiffs do not believe that every aspect of natural or divine law should be enforced through human law. But, just as Plaintiffs do not believe their views should be mandatory for others, Plaintiffs object to being compelled to personally express support for views they do not hold.

33.     Plaintiffs believe that "rebellion," when directed against the idea of absolute truth or universal moral norms, is wrong, both because it represents rebellion against God and because it harms the human beings that participate in the rebellion.

34.     Plaintiffs reject all branches of "critical theory"—the idea that all human history, all existing institutions, all social norms, and all moral rules should be evaluated through the lens of group conflict along the lines of race, sex, religion, wealth, sexual orientation, gender identity, or the like.

35.     Plaintiffs acknowledge the reality of human oppression but believe that viewing every aspect of existence as a function of group competition for

hegemony is reductionist and false. Plaintiffs believe that the best ideas, rules, institutions, and norms are rooted in objective truth and are not merely the edicts of a reigning oppressor group.

36.     Plaintiffs believe that God's design for human sexuality, marriage, and the family is a part of the natural law. They believe that marriage is a permanent, exclusive union of one man and one woman and is the only appropriate context for human sexual intimacy. They believe that reserving sexual intimacy for marriage protects and advances the interests of men, women, and the children they may beget.

37.     Plaintiffs wish to continue their education without being forced to join groups or support the expression of other groups that contradict their views or advocate for and engage in practices they believe are harmful and immoral.

## II.     Defendant Wisner forced Plaintiffs and hundreds of other students to pay a $99 fee to join her organization called "The Rebellion Community" that supports views and practices Plaintiffs reject.

### A. Defendant Wisner redesigned her course to promote her own political activism.

38.     Defendant Wisner teaches MKT 250, "Business Communication," a required course for every student at the University's Broad College of Business.

39.     As a required course, MKT 250 has an enrollment of approximately six hundred students each semester.

40.     For several years, Defendant Wisner took a conventional approach to teaching this course by covering standard forms of business communications, like memoranda and presentations.

41.     Then, in May 2021, Defendant Wisner gave a "Tedx Talk" outlining her own ideological journey toward political activism.[5]

42.     Defendant Wisner explained that she believes that most social expectations, especially in the realm of sexual morality and the family, are not objective moral values but are instead synthetic strictures that should be discarded by anyone who feels constrained by them.

43.     "Where do these rules even come from?" she asks, referring to rules about sexuality and child-raising. "It's the patriarchy!" she answers.[6]

44.     As her Tedx Talk's title suggests, Defendant Wisner wants people to "Reject the Rules and Discover Your Truth."

45.     Defendant Wisner did not just express this message on her own time; she used her semesterly cohort of six hundred students in MKT 250 as both an audience and a source of conscripted support for her political speech.

46.     Defendant Wisner re-designed her course to reflect her own newfound political views. She admittedly stopped assigning grades in the course and stopped teaching traditional forms of business communication in favor of focusing on personal exploration and (what she perceives as) "growth."

47.     Explaining her new approach on a University-produced podcast, Defendant Wisner acknowledged that she stopped emphasizing forms of

---

[5] Amy Wisner, *Awaken the Rebel Within: Reject the Rules and Discover Your Truth*, YOUTUBE.COM (May 27, 2021) *recording available at* http://bit.ly/3KCC7wc (accessed April 5, 2023).

[6] *Id.* at 7:55.

communication that students would be expected to know in the business world, but that her discretion permitted her to take the course in the direction she wanted.[7]

48.     The University does confer this discretion on Defendant Wisner. For example, its "Code of Teaching Responsibility" grants instructors the authority to determine course content, grading, and classroom procedures.[8]

49.     The Code of Teaching Responsibility further grants instructors the right to determine which materials are "required," including the authority to specify which "materials [are] to be purchased."[9]

50.     Included among the "materials" an instructor may specify under the authority conferred by the Code of Teaching Responsibility are "Internet sites" and "Subscriptions."[10]

51.     While Defendant Wisner was retooling her University-required course, she was also setting up sources of revenue to fund her new passion.

52.     On August 16, 2022, Defendant Wisner set up a "GoFundMe" campaign to raise money for "an RV roadtrip [sic] around the United States to co-create communities of rebels committed to doing the work" and "igniting action at the local level." A true and accurate copy of Defendant Wisner's "GoFundMe" page is attached to this Complaint as Exhibit A.

---

[7] *See* The Hatchcast, *The Rebel Professor's Crash Course in Professional Growth* (May 20, 2022) *recording available at* https://apple.co/3GeN1Wf (last accessed April 5, 2023).

[8] Mich. State Univ., *Academic Programs Catalog: Code of Teaching Responsibility*, *available at* https://bit.ly/448mrbK (accessed April 26, 2023).

[9] *Id.*

[10] See Mich. State Univ., *MSU Syllabus Checklist* at 4 (July 2017) *available at* http://bit.ly/3UyT0LB (accessed April 12, 2023).

53.    Defendant Wisner's "GoFundMe" campaign included various "donation levels" which included a tier that provided "one year of access to The Rebellion Community." Ex. A at 2–4.

54.    The Rebellion Community is an expressive organization established and controlled by Defendant Wisner.

55.    The Rebellion Community has a primary website called https://www.therebellion.online, in addition to other associated websites and social media accounts.[11] For purposes of this Complaint, "The Rebellion Community" refers to the organization created and controlled by Defendant Wisner. "The Rebellion Community Website" refers to all pages on the "www.therebellion.online" domain.

56.    The Rebellion Community associates primarily through The Rebellion Community Website, but also engages in expressive associational activities across other websites, other social media platforms and through other events.

57.    Defendant Wisner also set up another website called "https://cancelthepatriarchy.org," which hosts a page allowing visitors to join "The Rebellion Community" for the same $99 membership fee she charged Plaintiffs. A true and accurate copy of this page is attached to this Complaint as Exhibit B.

58.    For $34.99, visitors to "https://cancelthepatriarchy.org" can also pre-order a forthcoming book entitled, *The Rebellion: Transforming Society with*

---

[11] This domain still exists and, on information and belief, is still under the control of Defendant Wisner. The contents of this website have changed since the time of the events giving rise to the allegations in this Complaint.

*Radical Authenticity*, and receive a "FREE" t-shirt upon placing the book pre-order. A true and accurate copy of the Rebellion Book pre-order page is attached to this Complaint as Exhibit C.

59.     Since at least June 19, 2022, Defendant Wisner has also been soliciting pre-orders for *The Rebellion: Transforming Society with Radical Authenticity*. A true and accurate copy of the Instagram post soliciting book pre-orders is attached to this Complaint as Exhibit D.

60.     Defendant Wisner also solicited pre-orders for the book on her Facebook page, posting that the book would be "coming December 5, 2022." A true and accurate copy of Defendant Wisner's Facebook post soliciting book pre-orders is attached to this Complaint as Exhibit E.

61.     In her Facebook post, Defendant Wisner represented that the book would be available through "TheRebellionBook.com." Ex. E at 2. As of the time of the filing of this Complaint, this webpage is nonfunctional.

62.     On information and belief, the book has not been published and no copies have been sent as of the time of the filing of this Complaint.

**B. When the University adopted a policy that "encouraged" donations of "payments" received from assigned materials Defendant Wisner further redesigned her course to fund her political activism.**

63.    On August 16, 2022, Defendant Jeitschko promulgated a policy entitled, "Faculty Authored Works Assigned to Students and Perceived Conflicts of Interest" ("the Conflicts Policy").[12]

64.    The Conflicts Policy addresses circumstances where instructors assign their own work from which they derive some financial benefit (*e.g.*, royalties). In addition to the fairly common scenario of a professor assigning his or her own scholarship, the Conflicts Policy sweeps far more broadly, covering all "materials" whatsoever, including "other types of course materials" like "courseware, or software that supports course participation."[13]

65.    The Conflicts Policy permits instructors to assign "materials" from which they derive "payments," but says instructors are "expected" (but not required) "to forego any royalties or payments they derive from the sales of textbooks *or other course materials* to their own students and are *encouraged*" (but again not required) "to donate to a charity or fund that" (in the instructor's sole discretion) "would benefit students."[14]

66.    The Code of Teaching Responsibility and The Conflicts Policy will be collectively referenced as "the Policies."

---

[12] Mich. State Univ., *Fac. Authored Works Assigned to Students and Perceived Conflicts of Int.* (Aug. 16, 2022)  *available at* https://bit.ly/3oY5XCT (accessed May 1, 2023).

[13] *Id.*

[14] *Id.* (emphasis added).

67.     Defendant Wisner had already used her authority under the Code of Teaching Responsibility to change her in-class speech to match her personal politics, and she had already launched out-of-class efforts to financially support her personal off-campus activism.

68.     Now Defendant Wisner used the new Conflicts Policy to mix the two: she began using in-class requirements to tap her students as a source of financial support for her personal, off-campus advocacy and activism.

69.     In the Fall of 2022, Defendant Wisner began requiring students to purchase a subscription to "The Rebellion Community" as a condition of participation in her MKT 250 course.

70.     Defendant Wisner changed the curriculum and structure of a University-required course to promote her own political views and then required students to finance and join her outside expressive association as a condition of completing the course.

71.     On information and belief, Defendant Wisner exercised and continues to exercise control over The Rebellion Community, all of its websites and social media accounts, and all of the funds received through those websites and social media accounts, from MSU students including Plaintiffs, or from any other source.

**C. Defendant Wisner forced Plaintiffs and hundreds of other students to pay membership fees to her organization to support Wisner's political speech and the political speech of outside organizations.**

72.    In the spring of 2023, Plaintiffs Barbieri and Radomski enrolled in Defendant Wisner's MKT 250 course, which each was required to take in order to complete his degree.

73.    The Spring 2023 syllabus notes under "course requirements," that each student must purchase "The Rebellion Community membership." A true and accurate copy of the MKT 250 Spring 2023 Syllabus is attached to this Complaint as Exhibit F.

74.    Each instructor promulgates their course syllabus under the authority granted by the Policies and in advance of the course. Each course syllabus is available to the Provost and the respective Deans for review, including the Defendants.

75.    Defendant Wisner's MKT 250 Spring 2023 Syllabus was promulgated under the authority Defendant Wisner possessed through the Code of Teaching Responsibility. All Defendants had the opportunity, the authority, and the duty to ensure that the MKT 250 Spring 2023 Syllabus did not violate the constitutional rights of any student, including Plaintiffs, and all Defendants failed to execute their duty.

76.    The Conflicts Policy states, "Instructors are expected to discuss this plan with their department chair/school director and students to alleviate any

concerns and educate them."[15] Defendant Whipple is Defendant Wisner's
"department chair/school director" under this policy.

77.     Defendant Whipple had the authority and the duty to disapprove
Defendant Wisner's requirement that students purchase a membership for her
website when all of the services related to the class could have been provided for
free through the D2L program and the funds were used instead to support
unrelated, outside political advocacy.

78.     As the syllabus explains, "The Rebellion Community . . . is a global
social learning community with a private space dedicated to this course." Once the
students (under compulsion) join the "Community," they "will have access to shared
spaces that are used by members of the broader community." Ex. F at 3.

79.     Students were instructed to pay the required membership fee by
visiting the following URL https://www.therebellion.online/checkout/the-rebellion-
msu. *Id.*

80.     Once Plaintiffs paid the online subscription fee and navigated to the
website, they saw a statement that said, "Your membership fees are used to (1) pay
for use of the technology and (2) pay guest speakers, educators, and facilitators.
**Your professor does not receive any financial compensation from your
membership fees as that would be a conflict of interest.**" A true and accurate
copy of this webpage is attached to this Complaint as Exhibit G.

---

[15] *Supra* note 12.

81.   Defendant Wisner also stated in class that she did not benefit from the membership fees.

82.   Defendant Wisner's in-class statements led Plaintiffs to believe that she was entirely unaffiliated with The Rebellion Community.

83.   On information and belief, Defendant Wisner intended that her statements would mislead Plaintiffs and other students to believe that she was entirely unaffiliated with The Rebellion Community.

84.   On information and belief, Defendant Wisner knew that her statements would likely mislead Plaintiffs and other students to believe that she was entirely unaffiliated with The Rebellion Community and that The Rebellion Community had no connection to the University.

85.   Once Plaintiffs joined The Rebellion Community, they were instructed to comment "got it" on the welcoming post so that Defendant Wisner, and all other student members of The Rebellion Community, could see their participation. *See* Ex. G at 2.

86.   Plaintiffs were originally frustrated by having to pay the $99 membership fee because joining the group seemed unnecessary and duplicative. The University already has an online platform for course materials called "Desire to Learn" or "D2L." Most professors use D2L for their courses, which does not require students to pay an additional fee.

87.   Plaintiffs did not detect any functional advantage that The Rebellion Community Website had over the University's D2L system.

88.     On information and belief, Defendant Wisner could have posted all of the course content that she provided through "The Rebellion Community" on the University's D2L system instead of requiring each of her 600 students to pay a $99 subscription fee.

89.     Plaintiffs soon learned that Defendant Wisner personally controlled The Rebellion Community, The Rebellion Community Website, and all of its associated sites and resources.

90.     Plaintiffs also learned that Defendant Wisner was using the substantial funds she was extracting from each course (nearly $60,000 each time she taught the class) to engage in political speech Plaintiffs disagreed with and donating the funds to other organizations that also engage in political advocacy Plaintiffs disagree with.

91.     Plaintiffs discovered a Facebook post by Defendant Wisner that linked to another Facebook page associated with "The Rebellion Community." The post said, "The Rebellion community is a safe place to coordinate our efforts to burn everything to the fucking ground." A true and accurate copy of Defendant Wisner's Facebook post is attached to this Complaint as Exhibit H at 2.

92.     Defendant Wisner's post also said, "100% of membership fees are donated to Planned Parenthood." Ex. H at 2.

93.     Upon information and belief, Defendant Wisner used some of these funds to advance her own political advocacy. For example, Plaintiffs discovered

Defendant Wisner's "GoFundMe" page, which raises money in part by offering memberships for The Rebellion Community. *See* Ex. A at 3.

94.    The GoFundMe page explains, "100% of funds raised beyond these start-up costs [for the RV] will be donated to organizations doing the work of dismantling oppressive systems." *Id.*

95.    On information and belief, Defendant Wisner has used revenue generated from her unlawful requirement that Plaintiffs and other students pay membership fees to The Rebellion Community to purchase an RV.

96.    On May 1, 2023, Defendant Wisner posted to social media a video of an RV with the caption "Let the games begin!" A true and accurate copy of the archived page of Defendant Wisner's social media post is attached to this Complaint as Exhibit I.

97.    The Rebellion Community Website has a feature that reports the total number of users that have access to a particular "space" on the website.

98.    In the Spring of 2023, there were 574 people with access to the MKT-specific spaces, while there are 1157 people with access to the spaces that are open to all paying members of The Rebellion Community. A true and accurate copy of a page reporting membership of the MKT-specific space is attached to this Complaint as Exhibit J. A true and accurate copy of a page reporting membership of an open space is attached to this Complaint as Exhibit K.

99.    The total membership, 1157, is almost completely accounted for by the students that Defendant Wisner compelled to join The Rebellion Community

between the fall and spring MKT 250 courses (which each enroll approximately 600 students). Therefore, there are few, if any, fee-paying members of The Rebellion Community who are not MSU students.

100.    In addition, Defendant Wisner's GoFundMe page reports only $2,250 in revenue. *See* Ex. A at 2. This revenue is not by itself sufficient to purchase the RV in Defendant Wisner's social media post.

101.    Defendant Wisner has used funds generated by her requirement that students pay membership fees to The Rebellion Community to purchase the RV and to fund her own outside political speech and activism.

102.    Defendant Wisner has also used funds generated from her requirement that students pay membership fees to The Rebellion Community to financially support the political speech and activities of other outside organizations.

103.    For example, Defendant Wisner's other avenue for selling memberships to The Rebellion Community, the "https://cancelthepatriarchy.org" website, also offers memberships for $99 and reports that "Proceeds of The Rebellion Community membership fees are donated to organizations fighting systemic oppression." Ex. B at 2–4.

104.    Defendant Wisner charged spring 2023 MKT 250 students, including Plaintiffs, a membership fee that was 100% of the price she charged other members—MKT 250 students paid $99 for membership and members of the public pay $99 for membership.

105.   On information and belief, Defendant Wisner did not make any attempt to prorate student membership fees to correspond to any legitimate educational expenses of the MKT 250 course.

106.   Plaintiffs learned that Defendant Wisner had also compelled the Fall of 2022 MKT 250 class to purchase memberships for The Rebellion Community.

107.   Plaintiffs were aghast to learn that the fees they were compelled to pay as membership fees would be "donated to Planned Parenthood." Ex. H at 2.

108.   Plaintiffs believe that Defendant Wisner has forced them to materially support the homicide of innocent children.

109.   Based on the content on The Rebellion Community Website and Defendant Wisner's other speeches and posts, Plaintiffs also object to supporting the speech of The Rebellion Community and the unspecified "organizations fighting systemic oppression" that their money may also be supporting. *See* Ex. B at 3.

110.   For example, an Instagram page associated with The Rebellion Community posted a photo that says, "I would like all the women in my life to stop for a minute, take a long, deep breath, and burn everything to the fucking ground." A true and accurate copy of this Instagram post is attached to the Complaint as Exhibit L.

111.   Plaintiffs object to both the language of this post and the political message it espouses.

112.   Defendant Wisner also describes The Rebellion Community's content as "patriarchy-smashing content." *See* Ex. A at 5. While Plaintiffs would not define

the term this way, Defendant Wisner defines "patriarchy" as any expectation that couples should get married before having children.[16]

113.    Plaintiffs believe that God's design for marriage, sexuality, and family (which Defendant Wisner would imprecisely lump into the concept of "patriarchy") is good for both men and women and they oppose efforts to "smash" this order.

114.    The only option to subscribe to The Rebellion Community Website as required by the course syllabus also automatically renews the membership each year. Plaintiffs object to being required to purchase a membership for an outside organization that financially benefits Defendant Wisner and automatically renews even after the course concludes.

115.    Defendant Wisner used her authority under the Policies and consciously disregarded the rights of her students to advance her political agenda. Her ambition is to "expand [the course] and offer it to more students, hopefully eventually the entire student body."[17] And no wonder: Michigan State University's total undergraduate enrollment is approximately 39,021 students, which would increase Defendant Wisner's semesterly take from around $60,000 to over $3.8 million.[18]

---

[16] *See supra* note 5 at 1:49 (asserting that "The Patriarchy's Five Steps to Motherhood" involve engagement and marriage before having children).

[17] *Supra* note 7 at 1:04:00.

[18] *See* Mich. State Univ., *Office of the Provost*, https://provost.msu.edu/ (accessed April 12, 2023).

**III.  The Policies, as applied by Defendants, continue to authorize faculty to require students to pay membership fees and to donate proceeds to support outside political advocacy.**

116.  Once students learned of Defendant Wisner's social media posts that contradicted her original assurance that she was not receiving any financial benefit from the membership fees (*compare* Ex. G *with* Ex. A) and reporting that she was donating the fees to Planned Parenthood (*see* Ex. H), many students complained to university officials.

117.  These complaints reached Defendant Whipple, who placed Defendant Wisner on leave, assigned a different faculty member to complete this spring's iteration of MKT 250, and gave students a $99 credit to their University account. Defendant Whipple communicated these changes through an email delivered by another University official. A true and accurate copy of Defendant Whipple's email is attached to this Complaint as Exhibit M.

118.  However, Defendant Whipple's measures do not remedy the harm Ms. Wisner caused or ensure that the harm caused by the Policies will not be repeated. A $99 credit to the students' University account does nothing to erase the constitutional harm that already occurred, nor to stop Ms. Wisner from continuing to use the money she unlawfully extracted from Plaintiffs to support her own advocacy and the advocacy of organizations that Plaintiffs oppose.

119.  Further, Defendant Whipple's attempt at remedial measures demonstrates that her application of the Policies will continue to authorize faculty to require students to pay membership fees to political organizations and/or donate

proceeds of those fees to other outside political groups as a condition of course enrollment. This is evident for three reasons.

120.    First, Defendant Whipple attributes her actions to student complaints, not any violation of any University policy. She says, "We conducted a review of the MKT 250 Business Communication class and assignment materials *based on feedback*. We take student feedback very seriously as we strive for the best educational experiences for our students." Ex. M at 2 (emphasis added).

121.    Defendant Wisner's error, in Defendant Whipple's telling, was not violating any University policy; it was her imprudent social media posts that revealed the nature of her scheme, generating student complaints. Had there been no "student feedback," there would have been no corrective action. *Id.*

122.    Second, Defendant Whipple says that the basis for the refund is, again, not that the original fees were exacted in violation of any policy, but that "this material will *no longer* be required for the course" since it is being taught by a different instructor. *Id* (emphasis added).

123.    Defendant Whipple's email assumes that, to the extent a professor *does* require any materials, including materials involving a membership fee for an outside organization, the requirement is valid.

124.    Defendant Whipple's basis for giving $99 to the students in the Spring 2023 MKT 250 class who paid The Rebellion Community membership fees is that "*this* material" (referring to The Rebellion Community Website) is "no longer . . . required." *Id.* (emphasis added).

125.    Defendant Whipple has not disclaimed the legitimacy of requiring students to purchase membership fees for outside organizations as a condition of participating in any course at the University.

126.    In fact, The Conflicts Policy was adopted only a few months before Defendant Whipple's email and authorizes instructors to assign material from which they derive "payments" and then donate those payments to "a charity or fund" the instructor deems "would benefit students."[19] Defendant Whipple's email does nothing to ensure that the Policies, as applied, will not permit instructors to institute a similar requirement in any of Plaintiffs' classes.

127.    Third, Defendant Whipple did not instruct Defendant Wisner to return the money or even cancel the recurring memberships. The email notes, "Please review the Rebellion Community policy regarding subscription renewal. MSU will not provide reimbursements for subscription renewals." Ex. M at 2.

128.    Defendant Whipple has the authority and the responsibility to order Defendant Wisner to prevent the students from being charged another $99 membership fee, and to cancel the subscription, but she has refused to do so.

129.    Neither Defendant Whipple nor Defendant Jeitschko have acted to amend the Policies or confirm that they may not be applied to authorize faculty to require students to pay membership fees to outside groups as a condition of class participation or to donate proceeds of any "payments" received for "materials" to other outside advocacy organizations.

---

[19] *Supra* note 12.

130.   The Policies grant instructors the right to determine course content, grading, and classroom procedures and to determine what materials are "required," and "what must be purchased," including "Internet sites" or "Subscriptions." Such materials may include materials that generate "payments" for the instructor, and instructors are "encouraged" (but not required) to "donate" the proceeds to a "charity or fund" which (in the instructor's sole estimation) "would benefit students."[20]

131.   What would "benefit students" has no objective meaning or guidance.

132.   Defendants' response to Defendant Wisner's decision to force her students to pay nearly $60,000 in membership fees to join an outside organization that she controls and that engages in its own political advocacy and supports the political advocacy of other outside organization shows that the Policies, as applied, continue to authorize faculty to make similar choices—so long as they do so in a manner that does not generate a wave of student complaints.

**IV.   Plaintiffs are suffering ongoing, irreparable injury.**

133.   Applying Defendants' Policies, Defendant Wisner unlawfully forced Plaintiffs to join her outside political advocacy organization and to pay money to support Ms. Wisner's own advocacy (*see* Ex. A; Ex. I) and the political advocacy of other outside organizations (*see* Ex. B; Ex. H).

134.   Defendant Whipple's attempt to placate student outrage by offering a $99 credit does not stop Defendant Wisner from using the funds she extracted to

---

[20] *See supra* ¶¶ 47–50; 63–65 and accompanying notes.

advance political speech Plaintiffs disagree with, does not erase the violation of Plaintiffs' constitutional rights, and in fact, also serves to continue to violate them.

135.   At this time, Defendant Wisner is using funds generated by her unlawful requirement that students pay membership fees to The Rebellion Community to tour the country in an RV (which she purchased in part with these funds) and to engage in policy advocacy that Plaintiffs do not wish to support. *See supra* ¶¶ 91102 and Exs. A, I–K.

136.   Defendants' application of the Policies also continues to authorize all faculty to violate Plaintiffs' rights in the same way going forward. Each time Plaintiffs enroll in a class, the Policies subject them to further constitutional injury.

137.   Plaintiffs' injuries can only be remedied by damages, including recovering all of the money Defendant Wisner has taken, and by declaratory and injunctive relief against Defendant Wisner's ongoing violation of their rights and the University's Policies subjecting them to further deprivations of their constitutional rights.

## LEGAL ALLEGATIONS

138.   At all times relevant to this Complaint, all of the acts, policies, and practices alleged in this Complaint and attributed to Defendants were undertaken and maintained under color of a statute, regulation, or custom of the State of Michigan (i.e., under color of state law and authority).

139.   Defendants knew or should have known that they were violating Plaintiffs' constitutional and statutory rights and did violate their constitutional and statutory rights by compelling them to join and financially support an outside

organization engaged in expressive activity Plaintiffs do not support, and that donates to other outside organizations engaged in expressive activity that Plaintiffs do not support.

140.   Pursuant to the Policies as applied, Defendant Wisner's requirement that students pay a membership fee to The Rebellion Community, an organization under her control, and her initial efforts to disclaim this blatant "conflict of interest" reflects a purpose of infringing Plaintiffs' federally protected rights.

141.   The Rebellion Community is an expressive association.

142.   Defendant Wisner acted with reckless disregard for Plaintiffs' constitutional liberties.

143.   The University's Policies that authorized Defendant Wisner's unlawful acts remain in full force and effect and, as applied by Defendants, continue to subject Plaintiffs to further violations of their constitutional rights.

144.   Plaintiffs are suffering irreparable harm from Defendants' actions because Defendant Wisner is still using their funds to engage in and support political expression Plaintiffs do not wish to subsidize and Defendants continue to apply the Policies to authorize other faculty to engage in similar deprivations of Plaintiffs' property and constitutional rights.

145.   Plaintiffs have no adequate or speedy remedy at law to correct the deprivation of their rights by Defendants.

146.   Defendants have no legitimate, let alone compelling, interest to justify requiring students to pay membership fees to any outside organization,

including The Rebellion Community, as a condition of taking any course, including MKT 250.

147.    Requiring students to pay membership fees to The Rebellion Community is also not reasonably related to any legitimate pedagogical concern.

148.    Defendants' Policies have authorized Defendant Wisner's violation of Plaintiffs' rights and continue to subject them to further injury by authorizing faculty to compel students to pay membership fees under the guise of selecting "course materials."

149.    The application of the Policies to permit instructors to require students to pay membership fees to outside expressive associations also constitutes viewpoint discrimination.

150.    Defendants could achieve any of their legitimate interests through significantly less restrictive means than authorizing faculty to require students to pay membership fees to outside organizations as a condition of class participation. Use of the University's existing D2L system is one example of the many less restrictive alternatives that Defendants failed to utilize.

## FIRST CAUSE OF ACTION
### Compelled Speech
### (42 U.S.C. § 1983)

151.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1–150 of this Complaint.

152.    The Constitution protects Plaintiffs' right to speak and to refrain from speaking.

153.    Compelled speech imposes additional harm, and so requires an even more urgent justification.

154.    Compelled subsidy for the speech of others implicates the same First Amendment concerns as compelled speech.

155.    The government must withstand "exacting scrutiny" in order to furnish this more urgent justification for compelled speech, which requires showing that compelling Plaintiffs to speak furthers a compelling interest that could not be secured by significantly less restrictive means.

156.    Defendants have no compelling interest in applying the Policies to force Plaintiffs to pay a membership fee to The Rebellion Community and to financially support the political speech of The Rebellion Community or the other organizations to which The Rebellion Community or Defendant Wisner donate the proceeds of the membership fees.

157.    The speech of The Rebellion Community and the organizations it supports is not school-sponsored speech.

158.    The membership fees exacted by Defendant Wisner were not calculated to cover any legitimate expense of the MKT 250 course.

159.    The membership fees exacted by Defendant Wisner were used to support expression that was not related to the MKT 250 course or any legitimate pedagogical interest of the University.

160.    Defendants also have no legitimate pedagogical interest in forcing Plaintiffs to pay a membership fee to The Rebellion Community and to financially

support the political speech of The Rebellion Community or the other organizations

to which The Rebellion Community or Defendant Wisner donate the proceeds of the

membership fees.

161.   Defendants have no legitimate interest in authorizing any of its faculty

to require students to pay membership fees to outside expressive associations or to

donate the proceeds of such fees to other outside expressive associations as a

condition of class participation, as their application of the Policies currently

permits.

162.   Defendants could have used significantly less restrictive means to

achieve any of their interests, including by making the relevant course materials

available on the University's existing D2L platform.

163.   Because Defendants' Policies and actions under the Policies did not

further any legitimate interest and because there were significantly less restrictive

means available of achieving any legitimate interest of the University, Defendants

fail exacting scrutiny (and any other possible level of First Amendment scrutiny)

and have violated Plaintiffs' right to be free from compelled speech.

## SECOND CAUSE OF ACTION
### Compelled Association
### (42 U.S.C. § 1983)

164.   Plaintiffs repeat and reallege each of the allegations in paragraphs 1–

163 of this Complaint.

165.   The First Amendment protects Plaintiffs' right to associate, which

includes their right to be free from compelled association with groups they do not

wish to associate with.

166.    Forced association that affects in a significant way the ability of one person to advocate public or private viewpoints is unconstitutional unless it satisfies strict scrutiny—that is, unless the policy causing the forced association is narrowly tailored to achieve a compelling state interest.

167.    Forcing a person to *join* an expressive group they do not wish to join impacts their ability to express their preferred viewpoint just as concretely as forcing a group to *admit* a member the group would prefer not to admit.

168.    The Rebellion Community is an expressive association.

169.    Defendants have no legitimate, let alone compelling, interest in forcing Plaintiffs to become members of The Rebellion Community.

170.    Defendants have no legitimate interest in authorizing any of its faculty to require students to pay membership fees to outside expressive associations as a condition of class participation, as their application of the Policies currently does.

171.    Defendants' Policies authorizing faculty to force students to become members of outside advocacy groups as a condition of course participation are not narrowly tailored to achieve any governmental interest.

172.    Defendants could have used significantly less restrictive means to achieve any of their interests, including by making the relevant course materials available on the University's existing D2L platform instead of forcing students to become members of The Rebellion Community.

173.    Because Defendants Policies and actions under the Policies were not narrowly tailored to achieve any legitimate interest, Defendants' Policies and

32

actions fail strict scrutiny (and any other possible level of First Amendment

scrutiny) and have violated Plaintiffs' right to be free from compelled association.

### THIRD CAUSE OF ACTION
#### Unconstitutional Conditions
#### (42 U.S.C. § 1983)

174.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1–

173 of this Complaint.

175.    The Constitution also prohibits the government from conditioning

eligibility for a government benefit on the surrender of constitutional rights,

including the rights to free speech or free association.

176.    Defendants applied their Policies to compel Plaintiffs to surrender

their rights to be free from compelled speech, compelled association, and burden on

their religious exercise in order to be eligible to participate in MKT 250, a course

required for Plaintiffs to earn their degree.

177.    Membership in and financial support for The Rebellion Community is

not a legitimate requirement for completing MKT 250 and involves participation in

and support for expressive activities that are unrelated to any legitimate

pedagogical interest of the University.

178.    Defendants are further subjecting Plaintiffs to further deprivations of

their constitutional rights by applying their Policies to authorizing faculty to compel

Plaintiffs' speech and conditioning Plaintiffs' ability to enroll in other classes on

their willingness to surrender their constitutional rights.

179.    Defendants' Policies, as applied, have violated and continue to violate

Plaintiffs' right to be free from unconstitutional conditions.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

(A)    A declaratory judgment that Defendant Wisner's order to pay membership fees to join The Rebellion Community violated Plaintiffs' rights under the First Amendment and that the Policies as applied violate Plaintiffs' rights under the First Amendment;

(B)    A preliminary and permanent injunction ordering Defendant Wisner:

1) To return the funds Plaintiffs were forced to pay in membership fees to The Rebellion Community;

2) To refrain from using the funds she unlawfully obtained to further the political expression of The Rebellion Community;

3) To refrain from using the funds she unlawfully obtained to further her own political expression in any capacity, including her RV tour;

4) To refrain from donating those funds to other organizations, including but not limited to Planned Parenthood; and

5) To provide a full accounting of every expenditure that Defendant Wisner has financed with the proceeds of membership fees for The Rebellion Community.

(C)    A preliminary and permanent injunction ordering Defendants Jeitschko and Whipple:

1) To instruct all faculty that their discretion to select course materials does not include authority to require students to pay membership fees to outside organizations or to financially support any private expression; and

2) Not to apply the current Policies to authorize faculty to require students to pay membership fees to outside organizations or to financially support any private expression.

(D)     Nominal, and compensatory damages from all Defendants for the violation of Plaintiffs' First Amendment rights;

(E)     Nominal, compensatory, and punitive damages from Defendant Wisner for her purposeful violation of Plaintiffs' First Amendment rights;

(F)     Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(G)     All other further relief to which Plaintiffs may be entitled.

Respectfully submitted this 18th day of May, 2023.

*/s/ P. Logan Spena*
P. Logan Spena
VA Bar No. 98407
Tyson C. Langhofer
VA Bar No. 95204
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
lspena@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, Nolan Radomski, a citizen of the United States and a resident of the

State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 18TH day of ___May___, 2023, at ~~to es pm~~ Lake orion, MI .

## DECLARATION UNDER PENALTY OF PERJURY

I, Nathan Barbieri, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 10 day of May , 2023, at 1700 Parilla Cir Trinity, FL

37