## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**NATHAN BARBIERI**, et al.,

*Plaintiffs,*

v.

**THOMAS JEITSCHKO**, et al.,

*Defendants.*

**CASE NO.: 23-cv-00525**

**ORAL ARGUMENT REQUESTED**
(W.D. Mich. LCivR 7.2(d))

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION—ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... III

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 2

ARGUMENT ....................................................................................................... 7

    I.     Plaintiffs are likely to succeed in showing that Defendants are violating their constitutional rights. ....................................................................... 7

        A.     Defendants' Policies as applied are violating Plaintiffs' rights to freedom from compelled speech. .............................................................. 7

            1.     Policies authorizing governmental orders to subsidize the private speech of others are unconstitutional unless they survive "exacting scrutiny." ................................................................. 8

            2.     Defendants' Policies authorizing Wisner's order to pay membership fees to The Rebellion Community fail exacting scrutiny. .......................................................................... 12

            3.     Defendants' Policies authorizing Wisner's order to pay membership fees to The Rebellion Community fail any level of First Amendment scrutiny. ............................................... 13

        B.     Defendants' Policies as applied are violating Plaintiffs' right to freedom from compelled association. ....................................................... 14

            1.     Compelled association triggers strict scrutiny. ............................... 14

            2.     The Policies' application to compel Plaintiffs to associate with outside organizations fails strict scrutiny. ....................................... 15

    II.     Plaintiffs are suffering irreparable injuries. .............................................. 15

    III.     The balance of equities favors Plaintiffs. ................................................... 16

    IV.     Entering Plaintiffs' requested injunction will serve the public interest. ... 17

CONCLUSION ................................................................................................... 17

CERTIFICATE OF COMPLIANCE ........................................................................... 19

CERTIFICATE OF SERVICE ................................................................................... 20

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*American Civil Liberties Union v. McCreary County, Kentucky,*
  354 F.3d 438 (6th Cir. 2003)......................................................................... 15

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000) ...................................................................................... 15

*Branti v. Finkel,*
  445 U.S. 507 (1980) ...................................................................................... 16

*Connection Distributing Co. v. Reno,*
  154 F.3d 281 (6th Cir. 1998)...................................................................... 7, 17

*Déjà Vu of Nashville v. Metropolitan Government of Nashville,*
  274 F.3d 377 (6th Cir. 2001)......................................................................... 15

*Elrod v. Burns,*
  427 U.S. 347 (1976)...................................................................................... 1, 8

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ...................................................................................... 10

*Hazelwood School Disrict. v. Kuhlmeier,*
  484 U.S. 260 (1988) ................................................................................. 10, 13

*Janus v. American Federation of State, County, & Municipal Employees, Council 31,*
  138 S. Ct. 2448 (2018).................................................... 7, 8, 9, 10, 12, 13, 15, 16

*Knox v. Service Employees International Union,*
  567 U.S. 298 (2012) ...................................................................................... 14

*McGlone v. Bell,*
  681 F.3d 730 (6th Cir. 2012)......................................................................... 16

*Meriwether v. Hartop,*
  992 F.3d 492  (6th Cir. 2021).......................................................................... 1

*Miami Herald Publication Co. v. Tornillo,*
  418 U.S. 241 (1974)......................................................................................... 8

*Miller v. City of Cincinnati,*
  622 F.3d 524 (6th Cir. 2010)......................................................................... 15

*NIFLA v. Becerra*,
    138 S. Ct. 2361 (2018)..................................................................................... 8

*Obama for America v. Husted*,
    697 F.3d 423 (6th Cir. 2012)........................................................................... 7

*Pickering v. Board of Education*,
    391 U.S. 563 (1968)........................................................................................ 10

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)........................................................................................ 14

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957).................................................................................. 1, 17

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969)................................................................................. 10, 11

*Ward v. Polite*,
    667 F3d 727 (6th Cir. 2012)..................................................................... 9, 11

*West Virginia Board of Education v. Barnette*,
    319 U.S. 624 (1943)........................................................................................ 8

*Wooley v. Maynard*,
    430 U.S. 705 (1977)........................................................................................ 8

## INTRODUCTION

"Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *Sweezy v. New Hampshire*, 354 U.S. 234, 350 (1957). These freedoms are essential to the mechanism of our government, since without them there can be no "free functioning of the electoral process." *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion). But they also play a critical role in *sustaining* a free society. In that respect, "[t]he essentiality of freedom in the community of American universities is almost self-evident." *Sweezy*, 354 U.S. at 250. "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*

In our day, much commentary on this subject focuses on political balance or imbalance among university faculty or charges of indoctrination through the adoption of a state-selected orthodoxy. *See, e.g., Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) (warning against permitting universities to "wield alarming power to compel ideological conformity"). This case involves conduct so egregious that most other related disputes pale in comparison. Here, Defendants' policies have authorized a professor to use her position as an instructor in a required course to extract nearly $60,000 per semester from her students to fund her own political activism and the political speech of groups completely unaffiliated with the University.

Defendant Amy Wisner violated her students' rights to free speech and association by forcing them to pay a $99 membership fee to join "The Rebellion Community," an organization under her control, and then using that money to engage in expression and donate to other political organizations, activities which continue to this day. Plaintiffs seek an injunction to stop Defendant Wisner's ongoing violation of their rights and to halt Defendants' application of the policies

that authorized the violation and subject them to further constitutional deprivations.

## FACTUAL BACKGROUND

Plaintiffs Barbieri and Radomski are undergraduate students at Michigan State University ("the University"). Compl. ¶¶ 13–14. Each is required to take MKT 250, "Business Communication" in order to complete his course of study. *Id.* at ¶ 72. Defendant Amy Wisner teaches a section of Business Communications every semester, with an enrollment of around six hundred students per section. *Id.* at ¶¶ 38–39.

As business students, Barbieri and Radomski have enrolled at the University to gain both the knowledge necessary to succeed in their chosen fields and the credentials certifying that knowledge and commending them to future employers. *Id.* at ¶¶ 13–14, 24. So, in Business Communication, Plaintiffs anticipated they would learn about the techniques and forms of communication in which they would be expected to be proficient in the business world.

Defendant Wisner's course did not meet expectations. To Plaintiffs' chagrin, the course syllabus instructed them to pay a $99 membership fee to join an outside organization called "The Rebellion Community." *See id.* ¶¶ 73, 86; Compl. Ex. F at 3. The Rebellion Community is "a global social learning community" that hosted a "space dedicated to this course" but also connected students with "members of the broader community." Compl. Ex. F at 3. The University already has an online course platform called "Desire to Learn" that is available for use in all courses without an additional fee. Compl. ¶ 86. Most of Plaintiffs' other professors use this platform, but Defendant Wisner required them to pay $99 to join The Rebellion Community. *Id.* at ¶¶ 86–88. The Rebellion Community Website[1] did not appear to

---

[1] The Rebellion Community is an expressive association under Defendant Wisner's control that primarily associated through a website called "https://www.therebellion.online" but also operated several social media accounts and other sites. *See* Compl. at ¶¶ 54–55.

offer any functions that made it superior to the Desire to Learn platform. *Id.* at ¶ 87. But charging approximately six hundred students $99 each did one thing that Desire to Learn could not: it generated nearly $60,000 per semester in membership fees for The Rebellion Community. *Id.* at ¶¶ 88–90.

Upon paying the fee and joining The Rebellion Community, Plaintiffs were greeted with a notice that claimed, "Your professor does not receive any financial compensation from your membership fees as that would be a conflict of interest." Compl. Ex. G at 2. Then Plaintiffs later learned that this disclaimer was false. Defendant Wisner advertised for The Rebellion Community on her personal Facebook page, including a post that said, "100% of membership fees are donated to Planned Parenthood." Compl. Ex. H at 2. Plaintiffs adamantly oppose what Planned Parenthood stands for. Compl. ¶¶ 28, 107–08. Looking further, Plaintiffs also learned that Defendant Wisner had a "GoFundMe" page where she raised money—including by offering memberships to The Rebellion Community—to fund her personal political activism, including "an RV roadtrip [sic] around the United States to co-create communities of rebels committed to doing the work" and "igniting action at the local level." Compl. Ex. A at  2. This page also reported, "100% of funds raised beyond these start-up costs [for the RV] will be donated to organizations doing the work of dismantling oppressive systems." *Id.* at 3.

Defendant Wisner also set up another website, "https://cancelthepatriarchy.org," which advertised for The Rebellion Community. There, she offered memberships to the general public for $99—the same price she charged Business Communication students, including Plaintiffs. *See* Compl. ¶¶ 103–04. That website also reported, "Proceeds of The Rebellion Community membership fees are donated to organizations fighting system oppression." Compl. Ex. B at 3.

Many students, including Plaintiffs, objected to Defendant Wisner's use of their money for her own political activism and to support other private organizations engaged in political advocacy that had nothing to do with their course. Plaintiffs objected in particular because the expression The Rebellion Community engaged in is inconsistent with their views about morality and the relationship between social order and truth. *See* Compl. ¶¶ 107–113. Plaintiffs further objected to The Rebellion Community's encouragement to "burn everything to the f**king ground," and its assertion that traditional Christian moral teaching about marriage and the family constitute "patriarchy" that needs to be "smash[ed]." *Id.* at ¶¶ 110–113.

Plaintiffs also object to the expression of the other organizations Defendant Wisner boasted of supporting with their money. For example, Plaintiffs believe that all innocent life should be protected from conception until natural death. *See id.* at ¶ 28. Consequently, Plaintiffs deeply oppose abortion and would never willingly support Planned Parenthood, because to them, this is supporting homicide. *Id.* at 107–08. They were aghast to learn that Defendant Wisner had taken their money under false pretenses and was using it to support Planned Parenthood. *Id.* at ¶ 107.

Once students became aware of Defendant Wisner's use of the proceeds of The Rebellion Community Membership fees, they complained to Defendant Whipple (the Interim Dean of the College of Business). Defendant Whipple made a show of replacing Defendant Wisner with another instructor and giving participants in the spring 2023 Business Communications course a $99 University credit. *Id.* at ¶¶ 117–119; Compl. Ex. M at 2.

But, as it turned out, Defendant Wisner's requirement to pay membership fees to the Rebellion Community, which she then used to support her own advocacy and donated to support the speech of other groups, was actually adopted

in line with a new University policy. In August, 2022, Defendant Jeitschko promulgated "the Conflicts Policy," under which faculty are "encouraged" to "donate to a charity or fund" any "payments" derived from assigned "materials." Compl. ¶¶ 63–65 & n.12. In addition to the Conflicts Policy, the University's "Code of Teaching Responsibility" gives professors the right to determine course content and to determine which "materials" are "required," including which "materials" [are] to be purchased." *Id.* at ¶¶ 48–49 & n.8.

The Conflicts Policy and the Code of Teaching Responsibility (together, "the Policies"), in application, permit instructors to do exactly what Defendant Wisner did (the same semester as Defendant Jeitschko promulgated the Conflicts Policy): make purchasing a "subscription" to her website to join her outside organization a required "material" for the course and then donate the proceeds to outside political organizations (or use the proceeds for personal activism). *See id.* ¶¶ 48–50; 63–70 and accompanying notes.

Defendant Whipple's email announcing Wisner's replacement confirms that the Policies, as applied, continue to permit Plaintiffs' other professors to require students to pay membership fees to outside organizations as a condition of course participation—as long as they aren't as brazen as Defendant Wisner. For example, Defendant Whipple does not attribute the reassignment or the refund to any violation of University policy. Instead, she says her action was "based on feedback" from students. *Id.* at ¶ 120.

Next, Defendant Whipple says students will receive a credit because "this material will no longer be required for the course," since the Spring 2023 Business Communications course is to be completed by another instructor. *Id.* at ¶ 122. In Defendant Whipple's account, the requirement to join The Rebellion Community was *not* invalid when it was placed on the syllabus by Defendant Wisner; a credit is simply being offered because the requirements are changing mid-semester. *Id.*

Finally, Defendant Whipple reminds students to "review The Rebellion Community policy regarding subscription renewal" because "MSU will not provide reimbursement for subscription renewals." *Id.* at ¶ 127. This betrays Defendant Whipple's awareness that Defendant Wisner did not simply require students to pay $99 to join her organization; she made the subscription automatically renew. *See* Compl. at ¶ 114. In fact, the *only* way to subscribe to The Rebellion Community involves assenting to the automatic renewal—each student must affirmatively cancel their subscription, lest they pay Defendant Wisner another $99. *Id.* Defendant Whipple was aware of this, and she has authority over Defendant Wisner. *Id.* at ¶ 23. Yet, Defendant Whipple did not simply order Defendant Wisner to cancel the automatic renewals. *Id.* at ¶ 128.

Plaintiffs Barbieri and Radomski are suffering ongoing irreparable injuries. Defendant Wisner still has the money she expropriated from them and is using that money to fund her own political expression and to subsidize expression that Plaintiffs' conscience prohibits them from supporting. *Id.* at ¶ 135. The University's fig-leaf credit does nothing to correct this. Until Defendant Wisner is ordered to disgorge that money, she will continue violating Plaintiffs' constitutional right to be free from compulsion to subsidize private expression they do not wish to fund. *Id.* at ¶ 137. In addition, the Policies continue to authorize all of Plaintiffs' instructors to replicate the harm and force them to financially support outside groups and expression (so long as they aren't ham-fisted enough to generate widespread student complaints like Defendant Wisner). *Id.* at ¶¶ 132, 136–37. Only an injunction from this Court requiring Defendant Wisner to surrender an accounting of the funds, return their money, and require Defendants Jeitschko and Whipple to correct the application of the Policies will cure these ongoing irreparable injuries. *Id.* at ¶ 137.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction if they show that they are (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips" in their favor, and (4) "that an injunction is in the public interest." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quotation omitted). Because all four factors favor the Plaintiffs, this Court should enter the requested injunction

### I.    Plaintiffs are likely to succeed in showing that Defendants are violating their constitutional rights.

Plaintiffs Barbieri and Radomski assert violations of their constitutional right to be free from compelled speech and association under the First Amendment. In such cases, the likelihood of success is the most important factor. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor."). Plaintiffs are likely to succeed on their constitutional claims.

#### A.   Defendants' Policies as applied are violating Plaintiffs' rights to freedom from compelled speech.

By applying the Policies to compel Plaintiffs to pay to join The Rebellion Community, and then using those funds to support her own ongoing political activism and other political expression, Defendants are currently violating Plaintiffs' constitutional rights. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2478 (2018). Because the Policies as applied by Defendant Wisner fail "exacting scrutiny," *id.*, along with any other level of First Amendment scrutiny, Plaintiffs are likely to succeed on the merits of their claims.

1.  **Policies authorizing governmental orders to subsidize the private speech of others are unconstitutional unless they survive "exacting scrutiny."**

The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The government cannot force a person to personally recite words they do not wish to say. *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It cannot force people to print the private speech of others they do not wish to print. *See Mia. Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  It cannot force people to display words from the government they do not wish to display. *Wooley*, 430 U.S. at 717. *See also NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018). And it cannot get around these restrictions by forcing people to subsidize messages instead of directly forcing people to convey the messages themselves. *See Janus*, 138 S. Ct. at 2467. *See also Elrod*, 427 U.S. at 359  (the First Amendment does not permit "the government to produce a result which [it] could not command directly") (cleaned up).

"Because the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed." *Janus*, 138 S. Ct. at 2464. Considering the constitutionality of compelled financial support for labor unions as a condition of holding public employment, the Supreme Court recently concluded that the First Amendment *at least* requires that the compelled subsidies withstand "exacting scrutiny," if not "strict scrutiny." *Id.* at 2465. Under exacting scrutiny, a "compelled subsidy must serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (cleaned up).

a.  **Exacting scrutiny applies to in-class orders to subsidize out-of-class speech by third parties.**

The Sixth Circuit has agreed that the rules against compelled speech apply in the University context. As the court explained, the First Amendment's

intolerance for "viewpoint discrimination" also applies to compelled speech, since such orders are "compelling an individual to utter what is not in [her] mind and indeed what she might find deeply offensive." *Ward v. Polite*, 667 F3d 727, 733 (6th Cir. 2012) (cleaned up). This "prohibition" applies "too, in the public school setting." *Id.*

When a professor orders students, not just to say what the student "might find deeply offensive" in class as in *Ward*, but to subsidize out-of-class speech by third parties promoting messages the student finds offensive, that order must survive exacting scrutiny. The Supreme Court's recent analysis in *Janus* explains why.

In *Janus*, the Court overruled previous decisions that permitted public sector unions to make nonmembers pay a portion of regular union dues to compensate the unions for the expenses they incurred in collective bargaining. *See* 138 S. Ct. at 2486. Past decisions had reasoned that the employees' First Amendment rights against compelled subsidies for expressive activity were adequately protected so long as they were only required to pay the portion of regular dues that was "germane" to the union's collective bargaining activities. *Id.* at 2460. All the while, the Court had uniformly held that employees could not be "required to fund the union's political and ideological projects." *Id.* at 2460–61. In *Janus*, the Supreme Court found that this germaneness rule did not adequately protect objecting employees' interests, in part because even "speech that is germane to collective bargaining" includes "much" speech that "falls squarely into the category" of "speech that is of public concern." *Id.* at 2473. Thus, even a requirement to pay only for speech related to collective bargaining still crossed the line into funding "political and ideological projects," and was therefore required to withstand "exacting scrutiny." *Id.* at 2461, 2465.

What's notable is that the Supreme Court refused to apply the standard that typically applies to regulations of an employee's own speech. Generally, a government employer's regulation of employee speech is governed by the standards set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *See Janus*, 138 S. Ct. at 2472–73. The Janus Court questioned the applicability of those cases to compelled speech in general, but found them to be an especially "poor fit" where the government orders "subsidies in support of third parties." *Id.* at 2473–74.

Similar reasoning applies here. The *Pickering* standard governs the speech of the employee. The standard from *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) governs the speech sponsored by the school, and *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) governs private speech by students. But none of these standards focus on compelled support for expression by outside groups that is completely unrelated to the workplace or the school. Thus, just as the *Janus* court found the regular *Pickering* standard inapplicable to a workplace order to subsidize outside expression, so too are the *Hazelwood* and *Tinker* standards inapplicable to Policies authorizing a classroom order to subsidize outside expression. The correct standard for compelled subsidies of outside expression in either setting is the same: the government must withstand (at least) exacting scrutiny. *Janus*, 138 S. Ct at 2483 ("Our later cases involving compelled speech and association have also employed exacting scrutiny, if not a more demanding standard.").

### b. The Sixth Circuit's reasoning confirms that the *Hazelwood* and *Tinker* standards do not govern in-class orders to subsidize out-of-school speech by third parties.

The Sixth Circuit in *Ward* confirmed that rules against compelled speech apply in university programs, but the court applied the *Hazelwood* standard to an order controlling the speech of a counseling student within a practicum course. *See*

*Ward,* 667 F.3d at 733–34. But the court's reasoning explains why *Hazelwood* would not control an in-class order to subsidize out-of-class speech by third parties.

The *Ward* court expressly noted that *Hazelwood*'s applicability is limited because "*Hazelwood* also features a question crucial to the resolution of all school-speech cases, whether at the high school or university level: Whose speech is it?" *Id.* at 744. Where the speech has "less . . . to do with the curriculum and school-sponsored activities," another legal standard will govern, depending on the nature of the speech. *Id.* at 734. For example, a student's in-school speech that is noncurricular is governed by the familiar "substantial disruption" standard, not the *Hazelwood* standard. *Id.* (quoting *Tinker*, 393 U.S. at 514).

In this case, asking the same question ("Whose speech is it?") shows that the proper standard of review is the one applicable to outside speech by non-students, not in-school speech by students. Defendant Wisner used the fees she extracted from Plaintiffs in two ways—to further her own political activism and to donate to other "organizations fighting systemic oppression," each of which involve exclusively out-of-school speech. Compl. Ex. A at 2–3; Compl. Ex. B at 3. While the order to pay money was a condition of class participation, the speech that the money actually supported had no relationship to the classroom at all. Defendant Wisner's speech on her ongoing RV tour is not "school-sponsored" speech, Planned Parenthood's speech is not "school-sponsored" speech, and all of that speech is governed by First Amendment rules that apply outside the school context, not *Hazelwood* or *Tinker*. Because the "who" is non-students speaking outside of class, this is one of the situations that the *Ward* court explained will not be governed by *Hazelwood*. See *Ward*, 667 F.3d at 734.

2.  **Defendants' Policies authorizing Wisner's order to pay membership fees to The Rebellion Community fail exacting scrutiny.**

Under exacting scrutiny, a compelled subsidy is unconstitutional unless it (a) serves "a compelling state interest" and (b) "cannot be achieved through means significantly less restrictive of associational freedoms." *See Janus,* 138 S. Ct. at at 2465 (cleaned up). Defendant Wisner's application of the Policies to order her students to pay membership fees to The Rebellion Community fails both elements.

Forcing Plaintiffs and hundreds of other students to pay a $99 membership fee to The Rebellion Community, which Defendant Wisner has continued using to support her personal political advocacy and the advocacy of other organizations furthers no compelling state interest. It furthers no *state* interest at all. Defendant Wisner's application of the Policies focused on collecting membership fees which would be "donated to organizations fighting systemic oppression," not to achieving *any* University interest whatsoever. Compl. Ex. B at 3.

In addition, any conceivable interest of the University could have been achieved with significantly less restrictive means than authorizing faculty to force every student to pay money to join an outside expressive association. Most obviously, Defendant Wisner could have used the Desire to Learn system that the University created as a platform for online course materials. *See* Compl. at ¶¶ 86–88.

Defendant Wisner did not even try to make it look like The Rebellion Community membership fee that she charged to students was designed to cover actual course-related expenses. Instead, Defendant Wisner charged students exactly the same membership fee to join The Rebellion Community that she charged members of the general public. *Id.* at ¶¶ 103–105. This is comparable to the practice that was unconstitutional even before *Janus* imposed a higher standard, since it would be like forcing objecting employees to pay full union dues

instead of only "chargeable" expenses. *See Janus*, 138 S. Ct at 2461. Such an
action is all the more obviously unconstitutional under the applicable standard. *Id.*
at 2480 (noting that the prior standard was inadequately rigorous because it did
not inquire "whether [state interests] could have been adequately served without
impinging so heavily on the free speech rights of nonmembers").

No interest whatsoever supports Policies authorizing university professors
to force students to pay to join an outside advocacy organization and then use
those fees to engage in personal political activism or to support the political speech
of other organizations. And every legitimate interest of a university may be
achieved through means that are significantly less offensive to students'
constitutional interests. Therefore, Defendants' Policies authorizing Wisner's
compelled subsidy fail exacting scrutiny, and both Defendant Wisner's continued
use of Plaintiffs' funds to finance her political speech and Defendants' continued
application of their Policies violate Plaintiffs' First Amendment rights.

### 3.   Defendants' Policies authorizing Wisner's order to pay membership fees to The Rebellion Community fail any level of First Amendment scrutiny.

Defendant Wisner's application of the Policies to compel Plaintiffs to
subsidize and join The Rebellion Community fails under any standard. Even under
*Hazelwood*, the government's action must be "reasonably related to legitimate
*pedagogical* concerns." 484 U.S. at 273 (emphasis added). But Defendant Wisner's
use of the funds for her own political activism and to support the speech of other
outside organizations furthers no pedagogical concern whatsoever. Spending a
single dollar for these purposes, which she expressly claims that she has done and
is doing, causes the Policies authorizing her scheme to fail even under *Hazelwood*.

Further, the Policies authorizing her decision to force her students to pay to
join The Rebellion Community as a condition of taking Business Communications
are not "reasonably related" to any legitimate interest. *Id*. Every course objective

could have been achieved by using the University's existing Desire to Learn system. *See* Compl. at ¶¶ 86–88. The only reason to use The Rebellion Community was to extract students' money to finance advocacy unrelated to their education and which many, including Plaintiffs, found objectionable. Defendant Wisner's application of the Policies fails any level of First Amendment scrutiny, and so Plaintiffs are likely to prevail in showing that her continued use of their money to finance speech they oppose is violating their constitutional rights.

### B. Defendants' Policies as applied are violating Plaintiffs' right to freedom from compelled association.

The First Amendment also protects Plaintiffs' "right to associate," which "plainly presupposes a freedom not to associate." *Roberts v. U. S. Jaycees*, 468 U.S. 609, 623 (1984). Plaintiffs are likely to succeed in showing that the Policies, as applied, violate their right not to be associated by permitting faculty to order them to join expressive associations like The Rebellion Community as a condition of course participation.

### 1. Compelled association triggers strict scrutiny.

"[M]andatory associations are permissible only when they serve a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox v. Serv. Emps. Int'l. Union*, 567 U.S. 298, 310 (2012). It is "exceedingly rare" that the government may require a person to join an association or to "be required to pay [a] subsidy" to an association. *Id.* The Policies permit faculty to order students to subsidize and personally join groups they do not want to join. *See* Compl ¶¶ 130–132.

The groups that Plaintiffs may be ordered to join under applications of the Policies include expressive associations, which are groups whose purpose is to "engage in some form of expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The Policies, as applied, burden Plaintiffs' associational rights and are

subject to strict scrutiny. *See Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010) (a burden on associational rights exists where the governmental action controls who "become[s] members of [a] group"). *See also Déjà Vu of Nashville v. Metro. Gov't of Nashville*, 274 F.3d 377, 396 (6th Cir. 2001) (agreeing that burdens on associational rights trigger strict scrutiny).

### 2.  The Policies' application to compel Plaintiffs to associate with outside organizations fails strict scrutiny.

Exacting scrutiny is a "more permissive standard" than strict scrutiny. *Janus*, 138 S. Ct. at 2465. The Policies as applied to Plaintiffs cannot meet exacting scrutiny, or even any lower standard of First Amendment review. *See supra* Part I.A.2–3. So, the Policies cannot survive strict scrutiny either. *Janus*, 138 S. Ct. at 2465. Because the Policies' application to Plaintiffs burdens their associational rights and fails every standard of First Amendment review, Plaintiffs are likely to succeed on their free association claims.

## II.  Plaintiffs are suffering irreparable injuries.

Because Plaintiffs are likely to succeed on the merits, they are necessarily also suffering irreparable injuries. As the Sixth Circuit explained, "the Supreme Court held that when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is *mandated*." *Am. Civ. Liberties Union v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (emphasis added).

Defendants' decision to offer a $99 credit has not alleviated Plaintiffs' ongoing constitutional injuries. The initial order to pay $99 to join The Rebellion Community harms Plaintiffs in two ways. First and obviously, it harms them financially. But, second, "[w]hen speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable

is always demeaning . . . ." *Janus*, 138 S. Ct. at 2464. The credit from Defendant Whipple partially addresses only the financial injury; it does not address the constitutional harm. Defendant Wisner still has the money that she acquired from Plaintiffs through her unconstitutional act, and she is still using it to engage in political speech and to support other organizations' political speech. Compl. at ¶ 135. A credit does not stop this injury; only an injunction can.

In addition, Plaintiffs are suffering ongoing constitutional injury from the Policies' application to authorize other faculty to make Plaintiffs pay fees to or join outside organizations under the guise of selecting "course materials." To challenge a rule compelling speech or association, Plaintiffs need not show that they have actually "been coerced into changing, either actually or ostensibly, their political allegiance." *Branti v. Finkel*, 445 U.S. 507, 517 (1980). Rather, Plaintiffs need only establish the "intention to engage" in the activity that subjects them to the policy. *McGlone v. Bell*, 681 F.3d 730, 730–31 (6th Cir. 2012). Here, Plaintiffs are subject to the compelled subsidies for speech sanctioned by the Policies whenever they register for classes, as they intend to do as necessary to obtain their degree. *See* Compl. ¶ 24. Their rights were already violated once under the Policies, under a practice Defendant Wisner instituted the same semester that Defendant Jeitschko promulgated the Conflicts Policy. *See id.* at ¶¶ 63–69. They are therefore permitted to seek relief from additional applications of the Policies before facing any further deprivations of their constitutional rights.

## III. The balance of equities favors Plaintiffs.

The balance of equities favors Plaintiffs because enjoining government officials from continuing to violate constitutional rights will not injure them at all. Even in cases where the injunction does some practical harm to the government (as here, requiring Defendant Wisner to return expropriated funds), a likelihood of success on the merits tips the balance in Plaintiffs' favor, because the interest in

vindicating constitutional rights is so weighty. *See Connection Co.*, 154 F.3d at 288 (finding that, "although the government presumably would be substantially harmed if enforcement of a constitutional law aimed at fighting child pornography were enjoined," a likelihood of success on the merits would outweigh that harm). Defendants have no interest in any future application of the Policies to violate Plaintiffs' (or any students') rights to freedom from compelled speech or association, *see supra* Part I.A.2–3, so enjoining such applications will also not harm Defendants.

## IV.  Entering Plaintiffs' requested injunction will serve the public interest.

It always serves the public interest to enjoin government officials from violating citizens' constitutional rights. *See Connection Co.*, 154 F.3d at 288 ("the determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights.") (quotation omitted). The constitutional interests at stake in this case—the rights of speech and association in America's public universities—are vital, both to every individual, and to "our civilization" itself. *Sweezy*, 354 U.S. at 250. Enjoining Defendants' unconstitutional acts is essential for preserving this vital freedom for Plaintiffs Barbieri and Radomski, and the public at large.

## CONCLUSION

This Court should  issue an injunction (1) requiring Defendant Wisner to surrender an accounting of the funds, (2) return all of the funds, and (3) enjoin the Policies as-applied.

Respectfully submitted this 18th day of May, 2023.

*/s/ P. Logan Spena*
P. Logan Spena
VA Bar No. 98407
Tyson C. Langhofer
VA Bar No. 95204
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
lspena@ADFlegal.org
tlanghofer@ADFlegal.org


*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under W.D. Mich. LCivR 7.2(b)(i) because it contains 5,177 words, including headings, footnotes, citations and quotations, but excluding the case caption, table of contents, table of cases and authorities, signature block, exhibits, and any attachments. The word count was generated by Microsoft Word software.

Dated: May 18, 2023

*s/ P. Logan Spena*
_____

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2023, I electronically filed the foregoing using the CM/ECF system, and will serve the same with Plaintiffs' Verified Complaint on the following parties:

Thomas Jeitschko
Administration Building
426 Auditorium Road, Room 423
East Lansing, MI 48824

Judith Whipple
North Business Building
632 Bogue St, Room N520
East Lansing, MI 48824

Amy Wisner
16646 Eunice Street
East Lansing, MI 48823

Dated: May 18, 2023                    *s/ P. Logan Spena*

                                       *Counsel for Plaintiffs*