UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

**Nathan Barbieri** and **Nolan Radomski,**

                Plaintiffs,

v.

**Thomas Jeitschko,** Interim Provost and Executive Vice President for Academic Affairs of Michigan State University, in his official capacity; **Judith Whipple**, Interim Dean of the Michigan State University Broad College of Business, in her official capacity; **Amy Wisner**, Professor Marketing at the Michigan State University Broad College of Business, in her official and individual capacities,

                Defendants.

Case No. 1:23-cv-00525-PLM-RSK

Hon. Paul L. Mahoney

**Oral Argument Requested**
(WDMI LCivR 7.2(d))

_____/

Alliance Defending Freedom (VA)
Tyson C. Langhofer (VA Bar No. 95204)
Paul Logan Spena VA Bar. No. 98407)
44180 Riverside Pkwy.
Lansdowne, VA 20176
(571) 707-4655
lspena@adflegal.org
*Attorneys for Barbieri and Radomski*

Michigan State University
Office of the General Counsel
Elizabeth M. Watza (P81129)
426 Auditorium Rd., Rm. 494
East Lansing, MI 48824
(517) 353-4934
watzeli@msu.edu
*Attorneys for Jeitschko and Whipple*

Collins Einhorn Farrell PC
Deborah A. Lujan (P46990)
Hannah R. Brefeld (P86204)
Trent B. Collier (P66448) (he/him)
4000 Town Center, Floor 9
Southfield, MI 48075
(248) 355-4141
Deborah.lujan@ceflawyers.com
*Attorneys for Wisner*

_____/

# Brief in Support of Defendant Amy Wisner's Motion to Dismiss with Oral Argument Requested

# Table of Contents

*Index of Authorities*.................................................................................................*iii*

*Questions Presented* ................................................................................................ *v*

*Introduction* ............................................................................................................ *1*

*Facts and Procedural History*................................................................................ *4*

   A.  The University allows professors to use their own materials in class and encourages them to donate profits ............................................................ 4

   B.  Wisner requires students to use a website she developed ................................. 4

   C.  Barbieri and Radomski complain that Wisner's class was not a safe space ...... 5

   D.  Barbieri and Radomski make allegations about Wisner's private life............... 7

   E.  Procedural history ........................................................................................ 8

*Standard of Review*.................................................................................................. *9*

*Argument 1: Standing* ........................................................................................... *10*

   To establish standing, a plaintiff must show an actual injury—one that doesn't rely on speculation or other people's alleged injuries. Here, Barbieri and Radomski's claims concern $99 they have already been repaid and speculative claims about other people's hypothetical grievances. This Court should therefore dismiss any claims against Wisner under Fed. R. Civ. P. 12(b)(1) for lack of standing .................................................................................................... 10

     1.  Barbieri and Radomski's request for declaratory relief doesn't establish standing ....................................................................................................... 11

     2.  Barbieri and Radomski's request for an accounting and injunction doesn't establish standing................................................................................. 12

     3.  Barbieri and Radomski's request for nominal and compensatory damages doesn't establish standing ..................................................................... 13

     4.  Barbieri and Radomski cannot establish standing based on their request for attorney fees and costs ....................................................................... 14

*Argument 2: "Compelled Speech"* ................................................................ *14*

A party can state a compelled-speech claim only if they were actually compelled to speak. Barbieri and Radomski could have dropped Wisner's course. Furthermore, political speech in the classroom advances a compelling governmental interest in fostering academic freedom. And Wisner's alleged donation cannot support a constitutional claim because the funds at issue were her own money .................. 14

1.1  Barbieri and Radomski cannot establish genuine compulsion ................... 16

1.2  Wisner's actions served a compelling governmental interest ..................... 18

1.3  Wisner spent private money, not public money ........................................... 25

*Argument 3: "Compelled Association"* ........................................................ *29*

When evaluating a compelled-association claim, a court considers whether government action burdens the plaintiff and, if so, whether it serves a compelling governmental interest. Barbieri and Radomski shoulder no burden; the Sixth Circuit Court of Appeals has held that political speech is a necessary part of any classroom. Moreover, there is a compelling government interest: protecting what the Supreme Court has called the "transcendent value" of academic freedom ..... 29

*Argument 4: "Unconstitutional Conditions"* ............................................... *33*

Barbieri and Radomski assert a claim under 42 U.S.C. § 1983 based on the supposed constitutional injuries outlined in their complaint. As shown above, none of Barbieri and Radomski's constitutional arguments has merit. Consequently, the Court should dismiss Barbieri and Radomski's Section 1983 claim against Wisner ........................................................................................ 33

*Conclusion* ...................................................................................................... *34*

*Certificate of Service* ...................................................................................... *35*

*Certificate of Compliance* ............................................................................... *36*

# Index of Authorities

## *Cases*

*303 Creative LLC v. Elenis,* 143 S. Ct. 2298 (2023) .................................................... 15

*Apple v. Glenn,* 183 F.3d 477 (1999) ............................................................ 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 10

*Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426 (6th Cir. 2008) ............... 6, 18

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
457 U.S. 853 (1982) .......................................................................... 23

*Carney v. Adams,* 141 S. Ct. 493 (2020) ............................................... passim

*Christian Legal Soc. Chapter of the Univ. of Cal. V. Martinez,*
561 U.S. 661 (2010) .......................................................................... 22

*Citizens United v. Federal Election Comm'n,* 558 U.S. 310 (2010) ........................... 26

*Coal Operators and Assoc. v. Babbitt,* 291 F.3d 912 (6th Cir. 2022) ......................... 9

*Davis v. Colerain Township, Ohio,* 51 F.4th 164 (6th Cir. 2022) ........................ 13, 14

*Garcetti v. Ceballos,* 547 U.S. 410 (2006) ..................................................... 26

*Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457 (1997) .............................. 19

*Hazelwood School Dist. V. Kuhlmeier,* 484 U.S. 260 (1988) ..................................... 22

*Hurley v. Irish-American Gay, Lesbian, and Bisexual group of Boston, Inc.,*
515 U.S. 557 (1995) .......................................................................... 15

*Kennedy v. Bremerton School Dis't,* 142 S. Ct. 2407 (2022) ............................ passim

*Keyishian v. Bd. of Regents,* 385 U.S. 589 (1967) ..................................... passim

*League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523 (6th Cir. 2007) ...... 10

*Manhattan Community Access Corp. v. Halleck,* 139 S. Ct. 1921 (2019) ................. 26

*McCullen v. Coakley,* 573 U.S. 464 (2014) .................................................... 15

*Meriwether v. Hartop,* 992 F.3d 492 (6th Cir. 2021) ................................... passim

*Mikel v. Quin,* 58 F.4th 252 (6th Cir. 2023) ........................................... 11, 14

*Northeast Ohio Coalition for the Homeless v. Husted,*
837 F.3d 612 (6th Cir. 2016).................................................................... 10

*Pernell v. Florida Bd. of Governors of State University System,*
__ F. Supp.3d ___ (N.D. Fla. Nov. 17, 2022) ....................................... 23

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.,*
235 F.3d 1243 (10th Cir. 2000)............................................................... 16

*Russell v. Lundergan-Grimes,* 784 F.3d 1037 (6th Cir. 2015) .................... 19

*Settle v. Dickson County School Board,* 53 F.3d 152 (6th Cir. 1995)......... 22

*Shurtleff v. City of Boston, Mass.,* 142 S. Ct. 1583 (2022).......................... 26

*Sweezy v. New Hampshire,* 354 U.S. 234 (1957)................................... 20, 21

*Tinker v. Des Moines Independent Community Sch. Dst.,*
393 U.S. 503 (1969)........................................................................... 21, 23

*U.S. Citizens Ass'n v. Sebelius,* 705 F.3d 588 (6th Cir. 2013) .............. 30, 31

*Uzueghunam v. Preczewski,* 141 S. Ct. 792 (2021) .............................. 13, 14

*Ward v. Polite,* 667 F.3d 727 (6th Cir. 2012) ................................. 16, 17, 18

*West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624 (1943)......................... 15

*West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 1943 (1943) ............. 21

*Wilkins v. Daniels,* 744 F.3d 409 (6th Cir. 2014)........................................ 16

*Zelman v. Simmons-Harris,* 536 U.S. 639 (2022)........................................ 28

### Statutes

42 U.S.C. § 1983.......................................................................... vi, 3, 8, 33

42 U.S.C. § 1988............................................................................................ 9

### Rules

Fed. R. Civ. P. 12(b)(1)..................................................................... passim

Fed. R. Civ. P. 12(b)(6)..................................................................... passim

Fed. R. Civ. P. 9 ............................................................................................ 6

# Questions Presented

1. To establish standing, a plaintiff must show an actual injury—
   one that doesn't rely on speculation or other people's alleged
   injuries. Here, the plaintiffs' claims concern $99 they have
   already been repaid and speculative claims about other people's
   hypothetical grievances. Should this Court dismiss the plaintiffs'
   claims under Fed. R. Civ. P. 12(b)(1) for lack of standing?

   *Plaintiffs presumably answer:*                    *No.*

   *Defendants Amy Wisner answers:*                    *Yes.*

   *This Court should answer:*                         *Yes.*

2. A party can state a compelled-speech claim only if they were
   actually compelled to speak. The plaintiffs didn't have to enroll at
   the university and they could have dropped the defendant's
   course. Furthermore, political speech in the classroom advances
   a compelling governmental interest in fostering academic
   freedom. And the professor's alleged donation cannot support a
   constitutional claim because the funds at issue were her own
   money. Does the plaintiffs' compelled-speech claim fail as a
   matter of law?

   *Plaintiffs presumably answer:*                    *No.*

   *Defendants Amy Wisner answers:*                    *Yes.*

   *This Court should answer:*                         *Yes.*

3. When evaluating a compelled-association claim, a court considers
   whether government action burdens the plaintiff and, if so,
   whether it serves a compelling governmental interest. The
   plaintiffs shoulder no burden; the Sixth Circuit Court of Appeals
   has held that political speech is a necessary part of any classroom.
   Moreover, there is a compelling government interest: protecting
   what the Supreme Court has called the "transcendent value" of
   academic freedom. Does plaintiffs' compelled-association claim
   fail as a matter of law?

   *Plaintiffs presumably answer:*                    *No.*

v

*Defendants Amy Wisner answers:*                    *Yes.*

*This Court should answer:*                         *Yes.*

4.  The plaintiffs assert a claim under 42 U.S.C. § 1983 based on the supposed constitutional injuries outlined in their complaint. As shown above, none of the plaintiffs' constitutional arguments has merit. Should the Court should dismiss the plaintiffs' Section 1983 claim?

*Plaintiffs presumably answer:*                     *No.*

*Defendants Amy Wisner answers:*                    *Yes.*

*This Court should answer:*                         *Yes.*

# Introduction

Plaintiffs Nathan Barbieri and Nolan Radomski are students at Michigan State University. This lawsuit concerns a course they took with Professor Amy Wisner in spring 2023. They argue that Wisner violated their constitutional rights by requiring that they purchase a $99 subscription to an online platform called the Rebellion Community. The Rebellion Community's content is allegedly contrary to Barbieri and Radomski's understanding of Christian doctrine. They also assert a constitutional claim because Wisner allegedly donated proceeds from students' Rebellion Community subscriptions to Planned Parenthood, an organization Barbieri and Radomski dislike.

Barbieri and Radomski lack standing to bring this lawsuit. They paid $99 for a subscription and the University refunded that money. Any other alleged harms are speculative—or claims that belong to someone else. Wisner no longer teaches at the University, so no court order can shape her classes there. Consequently, there's no way for the Court to provide relief that addresses a present claim or controversy.

Barbieri and Radomski's claims lack substantive merit, too. Although this case primarily concerns Barbieri and Radomski's constitutional rights, those rights don't exist in a vacuum. The Court must evaluate those rights in light of Wisner's constitutional right to bring her political views into the classroom. *See Meriwether v. Hartop,* 992 F.3d 492, 498 (6th Cir. 2021). The plaintiff in *Meriwether*—represented by the Alliance Defending Freedom—argued that a professor has a First Amendment right to inject their politics into the classroom, even if some students find those views

contrary to their deeply held beliefs. The Sixth Circuit Court of Appeals agreed. Now, Barbieri and Radomski assert precisely the opposite view, neglecting a professor's free-speech rights and presuming that students can dictate the substance of their courses.

Barbieri and Radomski's arguments also rely on the premise that universities must insulate students from views they disagree with—that professors must create safe spaces to wrap students in the comfort of their own ideologies. In effect, Barbieri and Radomski seek a student's veto over any intellectual content they dislike, ignoring Wisner's constitutional right to present that material and their fellow students' constitutional right to hear it. As *Meriwether* shows, America's universities have never had a constitutional obligation to coddle students. And for good reason. Enforcing an orthodoxy—even through a student's veto—is anathema to the goals of higher education. *Meriwether,* 992 F.3d at 506.

Moreover, catering to students' political beliefs puts professors in an impossible bind. If they present supposedly conservative materials, they risk backlash from liberal students; if they present supposedly liberal materials, they risk backlash from conservative students. By upholding professors' right to bring their own politics into the classroom, federal courts have adopted the only tenable solution: the free exchange of ideas. Courts must reject lawsuits, like this one, that try to eliminate a professor's Free Speech rights.

As for Wisner's alleged donations to Planned Parenthood, students cannot dictate how a professor spends their own money. Federal courts have consistently

held that *private* choices by public officers are not subject to the First Amendment. *Kennedy v. Bremerton School Dis't,* 142 S. Ct. 2407, 2423 (2022). A coach can make the private choice to pray midfield during a high-school football game, even though he's only on that field because of his public employment teaching public-school children. Likewise, a public employee can make the private choice to donate their money to any charity they choose, even if they received that income through public employment. That's exactly how the Supreme Court has resolved issues like school vouchers funding religious education. A private choice severs public involvement.

The Court should dismiss all claims against Wisner under Fed. R. Civ. P. 12(b)(1) because Barbieri and Radomski lack standing. If the Court reaches the merits of their claims against Wisner, it should dismiss all claims against Wisner under Fed. R. Civ. P. 12(b)(6) as follows:

- Barbieri and Radomski's compelled-speech claim fails because no one compelled them to take MKT 250 in spring 2023. Additionally, academic freedom is a compelling government interest. And the Constitution does not grant Barbieri and Radomski a student's veto over how professors spend their private funds.

- Barbieri and Radomski's compelled-association claim fails because no one compelled them to take MKT 250 in spring 2023. Furthermore, academic freedom poses no burden on them and, even if it did, the "transcendent value" of academic freedom more than justifies that burden. Creating a student's veto would be a deathblow to academic freedom.

- Barbieri and Radomski's claim under 42 U.S.C. § 1983 fails for the reasons noted above.

Accordingly, this Court should dismiss all claims against Wisner under Fed. R. Civ. P. 12(b)(1) or (b)(6).

## Facts and Procedural History

Given the case's procedural posture, Wisner accepts the allegations in Barbieri and Radomski's complaint as true for purposes of this motion.

### A. The University allows professors to use their own materials in class and encourages them to donate profits.

Michigan State University is a public university. *Complaint,* ECF No. 1, PageID.4. The University's Code of Teaching Responsibility grants professors full authority to determine the content of their classes. *Id.*, PageID.10. A professor has the right to decide which materials their students must use. *Id.* Professors can also require the use of Internet sites and subscriptions. *Id.*

The University has a conflicts policy called "Faculty Authored Works Assigned to Students and Perceived Conflicts of Interest." *Complaint,* ECF NO.1, PageID.13. This conflicts policy allows professors to assign their own materials to students, even if they derive profit from students' use of those materials. *Id.* This policy "encourage[s]" professors to donate profits received through their courses to a charity that, in the professor's view, would benefit students." *Id.* Donating these profits is not mandatory under the University's policy. *Id.*

So a professor can use their own materials, profit from their students' use of those materials, and decide for themselves how to use these private funds.

### B. Wisner requires students to use a website she developed.

Wisner was a professor at the University's Broad College of Business. She taught MKT 250, a business-communications course. *Complaint,* ECF No. 1-6, PageID.58. In spring 2023, Wisner requested that her students purchase a

4

membership to the Rebellion Community, a web platform she created to advance dialogue on social issues. *Id.*, PageID.59. Consistent with the University's policy, this website was a replacement for a textbook. *Id.,* PageID.60. This website was also consistent with Wisner's pedagogical goals. She was a communications professor teaching business majors, and the Rebellion Community was about communication.

Students had to pay $99 to sign up for the Rebellion Community. *Complaint,* ECF No. 1, PageID.17. Requiring students to pay for this resource was consistent with the policies described in Barbieri and Radomski's complaint. *Id.*, PageID.13. Barbieri and Radomski allege that Wisner followed the University's policy and donated all proceeds from her students' use of the Rebellion Community to the charity of her choice—Planned Parenthood, according to their complaint. *Id.,* ECF No. 1, PageID.21.

## C. Barbieri and Radomski complain that Wisner's class was not a safe space.

Barbieri and Radomski are students at the University and they identify as Christians. *Complaint,* ECF No.1, PageID.6. Their complaint includes a series of statements about their understanding of Christian doctrine, including their assertion that Christian belief precludes any critical analysis of forces causing poverty. *Complaint,* ECF No. 1, PageID.7.

Barbieri and Radomski enrolled in Wisner's MKT 250 class, "a required course for every student at the University's Broad College of Business." *Complaint,* ECF No. 1, PageID.8. They don't allege that they were required to take MKT 250 in their sophomore year. In fact, they could have dropped Wisner's course without

consequences through the middle of the semester. *Exhibit A,* Late Drops, Adds and Section Changes. *See also Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008) (holding that a court can consider public records in the context of a Fed. R. Civ. P. 12(b)(6) motion). They could have even dropped the course and added a substitute within the first quarter of the semester. *Id.*

When they enrolled in Wisner's spring 2023 class, Barbieri and Radomski discovered the requirement to purchase a $99 subscription to the Rebellion Community. *Complaint,* ECF No. 1, PageID.14-15. This website included "a private space dedicated to [Wisner's MKT 250 course]." *Id.*, PageID.59. Consequently, Barbieri and Radomski knew that they would be working in a separate area for students, not in the community at large.

According to Barbieri and Radomski, they were "led … to believe that [Wisner] was entirely unaffiliated with the Rebellion Community." *Complaint,* ECF No. 1, PageID.17. They also assert that, instead of donating proceeds to Planned Parenthood as she allegedly represented, Wisner spent funds from the Rebellion Community on an RV that she uses "to fund her own outside political speech and activism." *Id.,* PageID.20. (Despite essentially accusing Wisner of fraud, Barbieri and Radomski cite no fraudulent statements and provide no details about when or to whom she made the offending statements. Accordingly, these fraud theories are not properly before the Court. *See* Fed. R. Civ. P. 9 (requiring specificity in fraud allegations)).

6

When students complained to University officials about Wisner's class, the University replaced Wisner with a different faculty member and gave students a $99 credit to their University account. *Complaint,* ECF No. 1, PageID.23. Barbieri and Radomski received this student credit. *Id.,* ECF No. 1-13, PageID.85.

### D. Barbieri and Radomski make allegations about Wisner's private life.

Barbieri and Radomski's complaint includes a number of allegations about Wisner's life outside the classroom. They attach a printout from Wisner's website, "cancelthepatriarchy.org." *Complaint,* ECF No. 1-2, PageID. 46-50. Yet Barbieri and Radomski never claim that Wisner required them to use the public portion of the website. Instead, Wisner's students had a "private space dedicated to [Wisner's] course." *Id.,* PageID.16. That much is clear from one of the complaint's exhibits: "As students at Michigan State University, you are part of *a private space within the broader community.*" *Id.,* PageID.70 (emphasis added).

Barbieri and Radomski also cite a Ted Talk that Wisner gave on May 27, 2021. This talk shared Wisner's personal experiences and some of the lessons she's learned in life. *Complaint,* ECF No. 1, PageID.9. Barbieri and Radomski didn't enroll in Wisner's course until spring 2023. *Id.,* PageID.15. So this material predates their involvement with the Rebellion Community.

Next, Barbieri and Radomski cite a June 19, 2022 post on Wisner' Instagram account, "cancelthepatriarchynow," which promoted her anticipated book. *Complaint,* ECF No. 1-4, PageID.54. Wisner also posted on her personal twitter account about

her upcoming book. *Id.,* PageID.56. Again, those posts predate Barbieri and Radomski's enrollment in Wisner's course.

Additionally, Barbieri and Radomski cite a GoFundMe page that Wisner created in August 2022 to raise money to buy an RV so she could travel and facilitate productive conversations. *Complaint, ECF* No.1-1, PageID.39-44. On May 1, 2023, Wisner posted on TikTok that she purchased an RV. *Id.,* PageID.74.

Aside from these immaterial allegations, Barbieri and Radomski also make personal attacks. They suggest that Wisner is opposed to the very concept of family. *Complaint,* ECF No. 1, PageID.22 ("Plaintiffs believe that God's design for marriage, sexuality, and family (which Defendant Wisner would imprecisely lump into the concept of 'patriarchy') is good for both men and women and they oppose efforts to 'smash' this order."). Wisner *has* a family. Barbieri and Radomski know that: they included a picture of her minor children in their federal complaint. *Id.,* PageID.39.

### E. Procedural history

Barbieri and Radomski filed their complaint on May 18, 2023. They allege that Wisner's class amounted to unconstitutionally compelled speech and compelled association. Their primary argument is that the University and Wisner had no legitimate interest in requiring the use of the Rebellion Community in MKT 250. They also allege that Wisner's course violated the Constitution by compelling their association with organizations they dislike. Finally, they assert a general claim under 42 U.S.C. § 1983.

With these claims, Barbieri and Radomski seek relief in various forms:

- They ask for an order declaring that having to pay $99 to join the Rebellion Community violated their First Amendment rights.

- They request an injunction that requires Wisner to (a) return funds students paid to join the Rebellion Community, (b) refrain from using student funds received through the Rebellion Community to advance her own political views, and (c) provide "a full accounting of every expenditure that Defendant Wisner has financed with the proceeds of membership fees for the Rebellion Community."

- They seek an injunction against Interim Provost Thomas Jeitscho and Interim Dean Judith Whipple.

- They ask for "nominal and compensatory damages" for violations of their First Amendment rights.

- They request "reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988.

For the following reasons, the Court should dismiss Barbieri and Radomski's claims against Wisner under Fed. R. Civ. P. 12(b)(1) or (b)(6).

## Standard of Review

When a defendant challenges the Court's jurisdiction under Fed. R. Civ. P. 12(b)(1), the plaintiff must establish the elements of standing "with specificity." *Coal Operators and Assoc. v. Babbitt,* 291 F.3d 912, 916 (6th Cir. 2022). A court may dismiss a complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) when the "allegations of a complaint are totally implausible, attenuated, unsubstantial, frivolous, devoid of merit, or no longer open to discussion." *Apple v. Glenn,* 183 F.3d 477, 479 (1999).

For a motion under Fed. R. Civ. P. 12(b)(6), the court "must construe the complaint in the light most favorable to the [nonmoving party] … [and] accept all

well-pled factual allegations as true." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). The complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). The nonmoving party must plead facts that allow the court to "draw the reasonable inference that the [moving party] is liable for the misconduct alleged." *Id.* at 678.

## Argument 1: Standing

**To establish standing, a plaintiff must show an actual injury—one that doesn't rely on speculation or other people's alleged injuries. Here, Barbieri and Radomski's claims concern $99 they have already been repaid and speculative claims about other people's hypothetical grievances. This Court should therefore dismiss any claims against Wisner under Fed. R. Civ. P. 12(b)(1) for lack of standing.**

Barbieri and Radomski's claims lack substantive merit, as shown below. But the Court doesn't need to reach those issues. It should dismiss any claims against Wisner because Barbieri and Radomski lack standing to pursue them.

Article III courts only adjudicate cases that "embody a genuine, live dispute between adverse parties…." *Carney v. Adams,* 141 S. Ct. 493, 498 (2020). A court cannot issue an "advisory opinion." *Id.* Therefore, a complaint "must show a concrete and particularized injury that is actual or imminent, a causal connection between the injury and the conduct complained of, and likelihood that a favorable decision will redress the injury." *Northeast Ohio Coalition for the Homeless v. Husted,* 837 F.3d 612, 624 (6th Cir. 2016).

A "conjectural or hypothetical" injury will not establish constitutional standing. *Carney,* 141 S. Ct. at 498. And "a grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.'" *Id.* It follows that a plaintiff cannot establish standing through "an abstract 'general interest common to all members of the public,' … 'no matter how sincere' or 'deeply committed' a plaintiff is to vindicating that general interest on behalf of the public." *Id.* at 499.

Each request for relief in Barbieri and Radomski's complaint proves that they lack standing and are seeking only advisory opinions and moot relief.

### 1. Barbieri and Radomski's request for declaratory relief doesn't establish standing.

Barbieri and Radomski ask for an order declaring that paying $99 to join the Rebellion Community violated their First Amendment rights. "Declaratory judgments," the Sixth Circuit Court of Appeals has held, "are not get-out-of-standing-free cards." *Mikel v. Quin,* 58 F.4th 252, 259 (6th Cir. 2023). A declaratory judgment is not an advisory opinion. *Id.* It "must have 'a conclusive character.'" *Id.* Consequently, a declaratory judgment is appropriate only when "it is substantially likely to redress a plaintiff's actual or imminent injuries." *Id.* (cleaned up).

Barbieri and Radomski paid $99. They've received a $99 refund. *Complaint,* ECF No. 1-13, PageID.85. A declaration would accomplish nothing—and it certainly wouldn't satisfy the requirement of "redress[ing] actual or imminent damages." *Mikel,* 58 F.4th at 258. Moreover, Wisner no longer teaches at the University. This

11

Court's opinion won't affect future courses (absent speculation and hypotheticals) and it would have no impact on real-world events involving these parties.

Barbieri and Radomski might posit that some other professor in some other course at some other time might charge students some other fee for some other resource. That kind of theory raises a purely "conjectural or hypothetical" injury. *Carney,* 141 S. Ct. at 498. Therefore, Barbieri and Radomski's request for a declaratory judgment does not establish standing.

### 2. Barbieri and Radomski's request for an accounting and injunction doesn't establish standing.

Barbieri and Radomski ask for an injunction that requires Wisner to (a) return student funds paid to join the Rebellion Community, (b) refrain from using student funds received through the Rebellion Community to advance her political views, and (c) provide "a full accounting of every expenditure that Defendant Wisner has financed with the proceeds of membership fees for the Rebellion Community." *Complaint,* ECF No. 1, PageID.34. This request for the return of funds is moot; the University has already refunded their payments. *Complaint,* ECF No. 1-13, PageID.85. The other requests fare no better.

The request to prevent Wisner from using the Rebellion Community to advance her political beliefs is moot. She no longer teaches at the University. The idea that there might be new constitutional objections based on new events is more speculation—and speculation doesn't create standing. *Carney,* 141 S. Ct. at 498.

As for Barbieri and Radomski's request for an accounting, they have already received a full refund of their money. The idea that an accounting might uncover

other students with similar grievances is speculation, and speculation doesn't establish standing. *Carney,* 141 S. Ct. at 498. Moreover, Barbieri and Radomski cannot establish standing based on others' generalized grievances. *Id.* Now that they've received a refund, the only remaining funds involve different students—some of whom may have different beliefs. So Barbieri and Radomski lack standing.

### 3. Barbieri and Radomski's request for nominal and compensatory damages doesn't establish standing.

Barbieri and Radomski request "[n]ominal and compensatory damages" for alleged violations of their First Amendment rights. *Complaint,* ECF No. 1, PageID.35. According to their complaint, there's nothing to compensate. Barbieri and Radomski have already received their $99 back. *Id.,* PageID.85. Although they make a cursory reference to compensatory damages, their complaint includes no factual allegations suggesting that Barbieri and Radomski themselves are entitled to compensatory damages.

A request for nominal damages can sometimes support standing. *Uzueghunam v. Preczewski,* 141 S. Ct. 792 (2021). But requesting nominal damages is not enough to "guarantee[] entry to court." *Id.* at 802. Nominal damages may address the question of redressabilitiy but "[i]t remains for the plaintiff to establish the other elements of standing." *Id. Uzueghunam* "said nothing about what it takes to plead a cognizable past injury under Article III." *Davis v. Colerain Township, Ohio,* 51 F.4th 164, 176 (6th Cir. 2022).

Barbieri and Radomski assert a claim to $99—but they've already received a refund. There's no cognizable past injury with respect to these funds. They also cite

possible future injuries but, as shown above, those claims are speculative. They argue that others might have a grievance based on Wisner's actions but "damages are available only for a violation of the plaintiff's own rights, not the rights of third parties." *Davis,* 51 F.4th at 176 (cleaned up). Therefore, Barbieri and Radomski's request for nominal damages does not establish standing.

### 4. Barbieri and Radomski cannot establish standing based on their request for attorney fees and costs.

Barbieri and Radomski request attorney fees and costs incurred in bringing this action. A request for attorneys' fees and costs does not establish standing. *Uzueghunam,* 141 S. Ct. at 801 ("A request for attorney's fees or costs cannot establish standing because those awards are merely a 'byproduct' of a suit that already succeeded, not a form of redressability."); *Mikel,* 58 F.4th at 258 ("An interest in recovering litigation expenses, to be sure, does not create standing on its own.").

For all of these reasons, Barbieri and Radomski cannot establish standing. This Court should dismiss their claims against Wisner under Fed. R. Civ. P. 12(b)(1).

## Argument 2: "Compelled Speech"

**A party can state a compelled-speech claim only if they were actually compelled to speak. Barbieri and Radomski could have dropped Wisner's course. Furthermore, political speech in the classroom advances a compelling governmental interest in fostering academic freedom. And Wisner's alleged donation cannot support a constitutional claim because the funds at issue were her own money.**

In Count 1, Barbieri and Radomski allege that the University and Wisner compelled them to speak in a manner that violates their religious beliefs. In

14

particular, they oppose being "force[d] … to pay for a membership fee to The Rebellion Community and to financially support the political speech of The Rebellion Community or the other organizations to which The Rebellion Community or Defendant Wisner donate the proceeds of the membership fees." *Complaint,* ECF No. 1, PageID.30. They argue that using the Rebellion Community in Wisner's class didn't advance a "legitimate pedagogical interest[.]" *Id.* In effect, they assert a student's veto over the content of their university classes.

The First Amendment's Free Speech clause protects independence in speech and thought. *303 Creative LLC v. Elenis,* 143 S. Ct. 2298, 2310 (2023). "By allowing all views to flourish," the Supreme Court wrote in *303 Creative*, "we may test and improve our own thinking both as individuals and as a Nation." *Id.* Consequently, "the government may not interfere with 'an uninhibited marketplace of ideas.'" *Id.* (quoting *McCullen v. Coakley,* 573 U.S. 464, 476 (2014)). Applying these principles, the Supreme Court held that the Constitution prohibited West Virginia from expelling and punishing students who refused to recite the Pledge of Allegiance. *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642 (1943). In another case, it prohibited Massachusetts from requiring a veterans' parade to "include a group of gay, lesbian, and bisexual individuals." *Hurley v. Irish-American Gay, Lesbian, and Bisexual group of Boston, Inc.,* 515 U.S. 557, 561(1995).

As these cases show, "the government may not compel a person to speak its own preferred messages." *303 Creative LLC,* 143 S.Ct. at 2312. A critical rule in compelled-speech cases, however, is that "a violation of the First Amendment right

15

against compelled speech occurs only in the context of actual compulsion." *Wilkins v. Daniels,* 744 F.3d 409, 415 (6th Cir. 2014). Typically, compulsion means "the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Id.* (quoting *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.,* 235 F.3d 1243, 1247 (10th Cir. 2000)). For example, punishments may include "imprisonment, fines, injunctions, or taxes…" *Wilkins,* 744 F.3d at 415. A "minimal and wholly subjective" punishment "does not … impermissibly deter the exercise of free speech rights." *Id.* (cleaned up).

Barbieri and Radomski's complaint doesn't allege a valid compelled-speech claim for three primary reasons. First, Barbieri and Radomski don't allege facts showing actual compulsion. Second, the University's policies and Wisner's actions serve compelling governmental interests: most notably, academic freedom. Third, Barbieri and Radomski incorrectly assert that Wisner's alleged use of proceeds from the Rebellion Community to support Planned Parenthood would involve public funds. It wouldn't. These proceeds belonged to Wisner and that means any charitable donation could not implicate Barbieri and Radomski's rights to freedom of speech. More below.

### 1.1  Barbieri and Radomski cannot establish genuine compulsion.

High school students are forced to attend high school. University students are not forced to attend university. The Sixth Circuit Court of Appeals has held that this fact is an important distinction between high-school and college-level Free Speech cases. *Ward v. Polite,* 667 F.3d 727, 734 (6th Cir. 2012) ("It may be true that

university students can handle more mature themes, but it is also true that they are not forced to be there, something that cannot be said about most students at public high schools."). University students have an opportunity to review the curriculum and decide which schools fit them best: "A prospective university student has the capacity to learn what a curriculum requires before applying to the school and before matriculating there." *Id.* at 734. Consequently, it is extremely difficult for college students to satisfy the "compulsion" element of a compelled-speech claim. As the *Ward* court put it, "When a university lays out a program's curriculum or a class's requirements for all to see, it is the rare day when a student can exercise a First Amendment veto over them." *Id.*

Today is not that "rare day." In spring 2023, Barbieri and Radomski were sophomores. *Complaint,* ECF No. 1, PageID.3. So they were freshman in fall 2021. According to Barbieri and Radomski, Wisner gave her patriarchy-smashing lecture in May 2021, *before* they matriculated at Michigan State University. They chose to study at the University and they chose to be business majors. Wisner is a communications professor and, as Barbieri and Radomski stress in their complaint, her views were widely available on the internet.

So Judge Sutton's logic in *Ward* applies here. If Barbieri and Radomski didn't like Wisner's philosophy, they could have chosen to study communications elsewhere. Instead, they chose Michigan State University, with Wisner and with the views she expressed in the most public forums possible. They had the "capacity to learn what a curriculum requires before applying to the school and before matriculating there."

17

*Ward,* 667 F.3d at 734. Under these facts, no one can reasonably claim that Barbieri and Radomski were *forced* to attend the University or *forced* to encounter Wisner's teaching. *Id.*

Even if one narrows the lens and looks only at Barbieri and Radomski's choices after they matriculated at the University, they're still unable to establish compulsion. Barbieri and Radomski's complaint doesn't claim that the University would punish or harm them if they dropped Wisner's claims. True, MKT 250 is "a required course for every student at the University's College of Business." *Complaint,* ECF No. 1, PageID.8. But they don't allege that any policy prevented them from dropping Wisner's class and taking MKT 250 another time.

Public records prove that Barbieri and Radomski could have dropped MKT 250 in spring 2023. *See Ex. A,* Late Drops, Adds and Section Changes. *See also Bassett,* 528 F.3d at 430 (holding that a court can consider public records in the context of a Fed. R. Civ. P. 12(b)(6) motion). They even could have dropped the course and added a substitute within the first quarter of the semester. *Id.*

Barbieri and Radomski may argue that, if they dropped MKT 250 in spring 2023, they may still have to take MKT 250 with Wisner and Wisner might still use the Rebellion Community in her class. That supposed harm is speculation. Courts don't entertain speculative constitutional claims. *Carney,* 141 S. Ct. at 498. Therefore, Barbieri and Radomski cannot establish compulsion.

### 1.2    Wisner's actions served a compelling governmental interest.

As the preceding analysis shows, Barbieri and Radomski's compelled-speech claim is invalid because they can establish neither standing nor coercion. This claim

has another problem: even if Wisner coerced Barbieri and Radomski to hear ideas from the Rebellion Community, that exposure serves a compelling governmental interest—academic freedom—and is therefore constitutional.

The United States Supreme Court has held that "just as the First Amendment prohibits compelled speech, it prohibits—*at least without sufficient justification by the government*—compelling an individual to 'render financial support for others' speech.'" *Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457, 471 (1997) (emphasis added). When reviewing a restriction on political speech, therefore, the Court should apply strict scrutiny and ask whether "the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Russell v. Lundergan-Grimes,* 784 F.3d 1037, 1050 (6th Cir. 2015). The burden of satisfying this test belongs to the government. *Id.*

There should be no dispute that free and open inquiry in the nation's classrooms is a compelling governmental interest. Case in point: *Meriwether v. Hartop,* 992 F.3d 492 (6th Cir. 2021). There, the Sixth Circuit Court of Appeals considered whether a public university could compel a university professor to use students' designated pronouns. The professor claimed that, according to his understanding of Christian doctrine, he's required to address students based on what he believes to be their gender assigned at birth. *Id.* at 503.

The Sixth Circuit Court of Appeals agreed that the professor had a right to address his students with whatever pronouns he deems best. It also stressed the importance of not stifling debate or shying away from difficult subjects in higher

19

education: "Traditionally, American universities have been beacons of intellectual diversity and academic freedom. They have prided themselves on being forums where controversial ideas are discussed and debated. And they have tried not to stifle debate by picking sides." *Meriwether,* 992 F.3d at 498. The Court chastised a university that tried to avoid exposure to a "hotly contested issue[s]." *Id.*  at 503.

*Meriwether* embraced principles that undermine Barbieri and Radomski's claims entirely. The Court treated the unfettered exchange of ideas in a classroom— even political ideas—as a compelling governmental interest. It cited cases like *Sweezy v. New Hampshire,* 354 U.S. 234 (1957) (plurality opinion), where the Supreme Court held that an inquiry into the content of the professor's lectures was "unquestionably" a violation of his First Amendment rights. *Sweezy,* 354 U.S. at 250. *See also Meriwether,* 992 F.3d at 504. It cited the "essentiality of freedom in the community of American universities." *Id.*

The Court also relied on *Keyishian v. Bd. of Regents,* 385 U.S. 589 (1967), where a New York law banned "subversive activity." *Id.* at 603. The Supreme Court held that academic freedom is "of transcendent value to all of us and not merely to the teachers concerned." *Id.* Consequently, the First Amendment prohibits laws that "cast a pall of orthodoxy over the classroom." *Id.* The stakes are high, according to *Keyishian*: "Our nation's future 'depends on leaders trained through wide exposure to [the] robust exchange of ideas'—not through the 'authoritative' compulsion of orthodox speech." *Meriwether,* 992 F.3d at 505 (quoting *Keyishian,* 385 U.S. at 603). *See also Tinker v. Des Moines Independent Community Sch. Dst.,* 393 U.S. 503, 508-

509 (1969) ("Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk. ...; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, and often disputatious, society.").

Relying on *Sweezy* and *Keyishian,* the Sixth Circuit Court of Appeals dismissed the idea of limiting "teacher speech" as "totally unpersuasive." *Meriwether,* 992 F.3d at 505. It also issued a warning: failing to honor academic freedom in classrooms could give universities "alarming power to compel ideological conformity." *Id.* at 506. In a democracy, "[t]hat cannot be." *Id.* Quoting *West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 1943 (1943)*,* the Court stated, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe such orthodoxy." *Meriwether,* 992 F.3d at 506 (cleaned up).

Under *Meriwether* and the cases cited in that opinion*,* it's clear that the government has a compelling interest in fostering open dialogue in classrooms *and* in protecting professors' right to insert their own political views into their teaching. *Meriwether* forcefully held that professors must be able to speak freely—even about political matters—in classrooms. Academic freedom, according to *Keyishian,* is "of transcendent value to all of us." *Keyishian,* 385 U.S. at 603. Upholding a "transcendent value" is surely a compelling governmental interest. Moreover, adopting Barbieri and Radomski's student's veto would require uniformity of thought

in the classroom and injure a "fixed star in our constitutional constellation." *Meriwether,* 992 F.3d at 506. In short, upholding the First Amendment is a compelling governmental interest. Granting the student's veto that Barbieri and Radomski seek here would undermine that interest completely.

Barbieri and Radomski's claim also fails to recognize that, although teachers have full First Amendment rights in a classroom, students do not. In *Settle v. Dickson County School Board,* 53 F.3d 152 (6th Cir. 1995), the Court held that a teacher could deny a student the right to write her research paper about Jesus Christ. *Id.* at 156. Rejecting the student's argument that the First Amendment granted her the right to write about her faith, the Court held that pedagogical interests were superior to the student's speech. *Id.* ("It is not for us to overrule the teacher's view that the student should learn to write research papers by beginning with a topic other than her own theology."). *See also Christian Legal Soc. Chapter of the Univ. of Cal. V. Martinez,* 561 U.S. 661, 686 (2010) ("Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review.") (cleaned up); *Hazelwood School Dist. V. Kuhlmeier,* 484 U.S. 260, 273 (1988) ("...[W]e hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.").

But students do have *some* First Amendment rights in the classroom—and granting Barbieri and Radomski's request for a safe space would interfere with *other* students' First Amendment rights. *Tinker,* 393 U.S. at 513 ("…[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or *invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.*") (emphasis added); *Pernell v. Florida Bd. of Governors of State University System,* __ F. Supp.3d ___, *12 (N.D. Fla. Nov. 17, 2022) (holding that "the right to receive information 'is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, in two senses.'") (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 867 (1982) (plurality opinion)); *id.* at *13 ("It logically follows that a university student's First Amendment right to receive a professor's viewpoints should flow from that professor's First Amendment right to express those viewpoints, for the former cannot be said to exist without the latter.").

This First Amendment right to hear professors' viewpoints belongs to students, not to Wisner. But it's important to note that adopting Barbieri and Radomski's argument will violate the constitutional rights of other students, in addition to Wisner.

So the policies at issue serve a compelling governmental interest: freedom of speech in classrooms. They protect other students' Free Speech rights. And they

impose a minimal burden on Barbieri and Radomski, particularly given the rule that there are limits to students' First Amendment rights in the classroom.

What about the requirement of a narrowly tailored policy? Wisner and the University supported these core constitutional values in the only way they could: they gave Wisner and every other professor the discretion to determine the content of their classes. *Complaint,* ECF No. 1, PageID.10. Giving professors free rein is not just a narrowly tailored way to advance the government's policy; full academic freedom *is* the constitutional policy. The only way to ensure freedom of thought and speech in classrooms is to protect freedom of thought and speech in classrooms. Consequently, the defendants' actions served a compelling governmental interest (freedom of speech and thought in classrooms) and they did so in a narrowly tailored manner (enacting polices that facilitated freedom of speech and thought).

Barbieri and Radomski's claims aren't just legally unsound; they're bad policy, too. Adopting a student's veto would create the very orthodoxy that *Meriwether* rejects as an affront to a "fixed star in our constitutional constellation." With a student's veto, a student could enroll in a literature class, argue that their understanding of Christian doctrine prohibits supposedly obscene literature, and prevent anyone from teaching James Joyce's *Ulysses*. A student could enroll in a biology class, argue that their understanding of Christian doctrine is contrary to evolutionary science, and prevent the biology department from teaching the most important principle in the biological sciences. A student could sign up for a computing course, argue that their understanding of Christian doctrine opposes artificial

24

intelligence, and avoid any analysis of one of the most important issues in contemporary society.

The student's veto would also apply to course materials. If they can object to paying $99 for the Rebellion Community website, then they can object on constitutional grounds to having to purchase books they dislike. They could object to purchasing *Beyond Good and Evil* by atheist existentialist Friedrich Nietzsche and they could object to purchasing *Fear and Trembling* by Christian existentialist Soren Kierkegaard. As long as one person's orthodoxy is another person's heresy—which seems to be a perennial state with humanity—then granting any student a veto over intellectual content stifles education and closes minds.

In fact, if Barbieri and Radomski are right, then a student could prohibit a professor from misgendering students. A student could assert that, as a Christian, they believe the Gospels require treating all people—including those who belong to the LGBTQIA community—with dignity and compassion. Ignoring a student's request about how they'd like to be addressed would violate these deeply held beliefs. Barbieri and Radomski apparently believe that theological views like these create a veto over professor's political views. *Meriwether* is proof that the Sixth Circuit Court of Appeals doesn't share this view.

Accordingly, even if Barbieri and Radomski have standing and even if they were compelled to take MKT 250 in spring 2023, their compelled-speech claim fails.

### 1.3    Wisner spent private money, not public money.

Barbieri and Radomski connect their objection to Wisner's speech with their allegation that she donated funds from the Rebellion Community to Planned

25

Parenthood. Their arguments overlook at important constitutional principle: When a public body gives funds to a private citizen to use as they see fit, those funds are *private* and therefore free from constitutional limits.

Barbieri and Radomski's arguments concern Wisner's donations, and donations are speech. *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 351 (2010). In the First Amendment arena, courts draw a sharp line between state speech and private speech: "The text and original meaning of [the First and Fourteenth Amendments], as well as this Court's longstanding precedents, establish that the Free Speech Clause prohibits only *governmental* abridgement of speech." *Manhattan Community Access Corp. v. Halleck,* 139 S. Ct. 1921, 1928 (2019) (emphasis in original). Consequently, "[t]he Free Speech Clause does not prohibit *private* abridgement of speech." *Id.* (emphasis in original). This distinction is critical: "By enforcing that constitutional boundary between the governmental and the private, the state-action doctrine protects a robust sphere of individual liberty." *Id. See also Garcetti v. Ceballos,* 547 U.S. 410, 419 (2006) ("So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.").

In *Shurtleff v. City of Boston, Mass.,* 142 S. Ct. 1583 (2022), the Supreme Court considered several factors in its "holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* at 1589. These factors include "the public's likely perception as to who (the government or a

private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589-1590.

In the context of public employment, the Supreme Court has engaged in a two-factor test to distinguish public from private speech. *Kennedy v. Bremerton School Dis't,* 142 S. Ct. 2407, 2423 (2022). First, the Court asks whether a person is speaking as part of their official duties. *Id.* at 2423. If so, their speech may be public rather than private. Next, the court "engage[s] in 'a delicate balancing of the competing interests surrounding the speech and its consequences.'" *Kennedy,* 142 S. Ct. at 2423.

In *Kennedy,* the Supreme Court considered whether a teacher was speaking in a public capacity when he prayed at midfield during a football game. *Kennedy,* 142 S. Ct. at 2424. It concluded that he wasn't. *Id.* His prayer wasn't within the scope of his duties. No government policy required his prayer. He wasn't conveying the government's own message. He wasn't instructing his students. His prayers "did not owe their existence to his responsibilities as a public employee." *Id.* (cleaned up).

Applying *Kennedy* to this case, it's plain that Wisner's alleged donations to Planned Parenthood would be private acts. Under the University's policy, any funds received through students' use of her materials belonged to Wisner. *Complaint,* ECF NO.1, PageID.13. That shouldn't be a controversial point: Barbieri and Radomski plead that the policies at issue concern the professors' own money. *Id.* (alleging that the "Conflicts Policy addresses circumstances where instructors assign their own work from which *they derive some financial benefit* (*e.g.,* royalties))" (emphasis added). The policies also establish that professors themselves decide how to spend

"payments" from their materials. *Id.* Donating those funds is optional, and professors have sole discretion over where to donate those funds. *Id.*

All of the factors that animated the result in *Kennedy* are present here. Kennedy had no duty to pray. *Kennedy,* 142 S. Ct. at 2424. Wisner had no duty to donate profits. *Complaint,* ECF NO.1, PageID.13. Kennedy didn't claim to convey the government's message. *Kennedy,* 142 S. Ct. at 2424. Wisner didn't claim to convey a message on the government's behalf. Kennedy wasn't instructing students when he was praying. *Kennedy,* 142 S. Ct. at 2424. Wisner wasn't instructing students when she allegedly donated her funds to Planned Parenthood. Kennedy's prayers didn't owe their existence to his responsibilities as a public employee. *Id.* Wisner's alleged support of Planned Parenthood didn't owe its existence to her public employment.

For these reasons, any alleged donations to Planned Parenthood would be in Wisner's private capacity, not her public one. The First Amendment doesn't regulate private conduct. Indeed, federal courts have held that private citizens who receive public funds can use those funds for purposes that a governmental entity could not.

For example, in *Zelman v. Simmons-Harris,* 536 U.S. 639 (2022), the Supreme Court considered the constitutionality of a school-voucher program that included religious schools. It held that "where a governmental aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools *wholly as a result of their own genuine and independent private choice*, the program is not readily subject to challenge under the Establishment Clause." *Id.* at 6552 (emphasis added). A private

28

choice severs the connection between the government and the funds' destination. That logic applies to the Free Speech Clause. When a private citizen decides how to spend formerly public funds, no one can reasonably attribute that decision to the government—just as no one could reasonably attribute Kennedy's prayer to the government. *Kennedy,* 142 S. Ct. at 2424.

Barbieri and Radomski may argue that Wisner only received funds to donate because she was a public employee who required use of the Rebellion Community in her classroom. But that's not enough to turn her actions from private to public. After all, the plaintiff in *Kennedy* only had a football field to pray on because he was a public-school teacher coaching public-school students. That connection did not suffice in *Kennedy* so it doesn't suffice here.

Accordingly, the "speech" in Barbieri and Radomski's compelled-speech claim is *private* speech. Private speech is not actionable. The Court should dismiss all claims against Wisner under Fed. R. Civ. P. 12(b)(6).

## Argument 3: "Compelled Association"

**When evaluating a compelled-association claim, a court considers whether government action burdens the plaintiff and, if so, whether it serves a compelling governmental interest. Barbieri and Radomski shoulder no burden; the Sixth Circuit Court of Appeals has held that political speech is a necessary part of any classroom. Moreover, there is a compelling government interest: protecting what the Supreme Court has called the "transcendent value" of academic freedom.**

In Count 2, Barbieri and Radomski assert that the defendants compelled their association with the Rebellion Community and that this compulsion violated their

First Amendment rights. *Complaint,* ECF No. 1, PageID.32. They assert that "[f]orcing a person to *join* an expressive group they do not wish to join impacts their ability to express their preferred viewpoint just as concretely as forcing a group to *admit* a member the group would prefer not to admit." *Id.* (emphasis in original).

Again, Barbieri and Radomski argue that there are "significantly less restrictive means" to achieve the University's educational goals. *Id.* They don't say what those means are.

The First Amendment of the United States Constitution guarantees to citizens a right of "expressive association," which includes the "right to associate for the purpose of speaking." *U.S. Citizens Ass'n v. Sebelius,* 705 F.3d 588, 600 (6th Cir. 2013). In other words, the First Amendment protects speech via "group effort." *Id.* By preventing forced association, the First Amendment grants "a freedom not to associate." *Id.* Any infringement on the right to associate must "be justified by regulations adopted to serve compelling state interests, unrelated to suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*

A court reviewing an expressive-association claim must consider three elements. First, a court must ask whether the plaintiff is a member of a group "entitled to protection." *U.S. Citizens Ass'n,* 705 F.3d at 600. Second, the court should consider whether "the government action in question significantly burdens the group's expression (affording deference to the group's view of what would impair its

expression).” *Id.* Third, the court should “weigh[] the government's interest in the restriction against plaintiff's right of expressive association.” *Id.*

Religious groups are certainly “entitled to protection.” So the Court can presume for argument's sake that Barbieri and Radomski's identification as Christians places them within a group “entitled to protection.” Still, Barbieri and Radomski's claim fails at the second prong (they can't establish a significant burden on their expression) and the third prong (even if there is a burden, the government's interests outweigh Barbieri and Radomski's interest in turning the classroom into a safe space).

As for the burden, the Court can rule out Wisner's political views as a “burden” on her students. The Sixth Circuit Court of Appeals expressly held that professors have a constitutional right to inject their politics into the classroom. *Meriwether,* 992 F.3d at 505. It stated that the prospect of limiting “teacher speech” is “totally unpersuasive.” *Id.* Far from being a burden on students, political speech is “of transcendent value to all of us and not merely to the teachers concerned.” *Keyishian,* 385 U.S. at 603. *Meriwether,* 992 F.3d at 505 (quoting *Keyishian,* 385 U.S. at 603). In other words, Wisner's speech—like any other professor's speech—was the very product that each student purchased with their tuition.

Wisner's alleged decision to donate her private funds to Planned Parenthood wouldn't burden Barbieri and Radomski's freedom either. She received those funds privately and any donation to a charity would follow the University's suggestion that professors donate proceeds from using their own materials to a charity of their choice.

*Complaint,* ECF NO.1, PageID.13. A professor's *private* use of funds doesn't burden a student's freedom in the least. Again, *Kennedy* provides the governing principles. A teacher may find himself on a public-school football field coaching a public-school team. *Kennedy,* 142 S. Ct. at 2424. But if the teacher makes the *private* choice to pray on a football field, that's a private act, not a public one—so it doesn't infringe on any student's First Amendment rights. So, too, with Wisner's alleged donation of funds to Planned Parenthood.

Suppose, though, that the defendants really did burden Barbieri and Radomski's freedom by exposing them to new ideas in a classroom. That burden serves a compelling public interest—one that the Supreme Court called "of transcendent value to all of us." *Keyishian,* 385 U.S. at 603. That value is academic freedom. This value is critical not only for students but for '[o]ur nation's future." *Meriwether,* 992 F.3d at 505 (quoting *Keyishian,* 385 U.S. at 603). That "transcendent value" was enough to justify a professor misgendering his students. That "transcendent value" still applies when a professor encourages the critical examination of race, gender, class, and the like.  Privileging one ideology over another is exactly what the Supreme Court and the Sixth Circuit Court of Appeals prohibited in *Meriwether* and *Kennedy*. One person's orthodoxy is another's heresy—which is exactly why the First Amendment doesn't pick sides.

So there's a compelling governmental interest. And the policies serving this "transcendent value" are as narrowly tailored as possible. There's no way to preserve

academic freedom in the classroom apart from guaranteeing each professor's freedom to express their own views.

Barbieri and Radomski's compelled-association claim also fails for the reasons noted above: no one compelled them to take MKT 250 in spring 2023. They could have dropped the course if they disliked it. Whether future courses would have included the same material is speculative. Accordingly, Barbieri and Radomski's compelled-association claim lacks merit. This Court should dismiss all claims against Wisner under Fed. R. Civ. P. 12(b)(6).

## Argument 4: "Unconstitutional Conditions"

**Barbieri and Radomski assert a claim under 42 U.S.C. § 1983 based on the supposed constitutional injuries outlined in their complaint. As shown above, none of Barbieri and Radomski's constitutional arguments has merit. Consequently, the Court should dismiss Barbieri and Radomski's Section 1983 claim against Wisner.**

In their third and final count, Barbieri and Radomski seek damages under 42 U.S.C. § 1983. They assert that they were compelled to encounter Wisner's speech, compelled to associate with Wisner and Planned Parenthood, and burdened when trying to follow their understanding of Christian doctrine. In effect, they argue that they're entitled to a student's veto over the intellectual content of their classes. They assert that the Wisner and the other defendants had no legitimate interest in using the MKT 250 platform. According to Barbieri and Radomski, "Defendants are further subjecting [them] to further deprivations of their constitutional rights by applying their Policies to authorizing [sic] faculty to compel Plaintiffs' speech and conditioning

Plaintiffs' ability to enroll in other classes on their willingness to surrender their constitutional rights." *Complaint,* ECF No.1, PageID.33.

As the preceding discussion shows, none of these arguments has merit. When they encountered Wisner's speech in the classroom, Barbieri and Radomski were witness to academic freedom—a "transcendent value" in constitutional jurisprudence. *Keyishian,* 385 U.S. at 603. Assuming that Wisner's Rebellion Community was ideological, that ideology imposed no greater burden than the *Meriwether* professor's belief that he has a right to decide his students' gender. Indeed, *Meriwether* welcomes ideology into the classroom. And Wisner's alleged donations to Planned Parenthood couldn't burden Barbieri and Radomski at all because she would be using her private funds.

As for Barbieri and Radomski's claim that the University "condition[ed] Plaintiffs' ability to enroll in other classes on their willingness to surrender their constitutional rights,' it's hard to tell what exactly they mean here. Their complaint cites no other classes. It cites no general policy. And it cites nothing like a policy requiring them to surrender constitutional rights. This is a legal argument in search of facts.

The bottom line: The principles stated in cases like *Meriwether* and *Kennedy* apply to Wisner, too. So Barbieri and Radomski's claims lack merit.

## Conclusion

Barbieri and Radomski lack standing. *See* Fed. R. Civ. P. 12(b)(1). Any burden on their speech serves a compelling interest. *See* Fed. R. Civ. P. 12(b)(6). They were

not required to matriculate at the University and they could have dropped Wisner's course. *Id.* Ultimately, they have no constitutional right to a safe space in university classrooms. *Id. Meriwether* proves that political views *belong* in classrooms. *Id.* This Court should dismiss all claims against Wisner under Fed. R. Civ. P. 12(b)(1) or 12(b)(6).

<div style="margin-left:40%">

Respectfully submitted,

Collins Einhorn Farrell PC

By: */s Trent B. Collier*
Deborah A. Lujan (P46990)
Hannah R. Brefeld (P86204)
Trent B. Collier (P66448) (he/him)
4000 Town Center, Floor 9
Southfield, MI 48075
(248) 355-4141
Deborah.lujan@ceflawyers.com
*Attorneys for Amy Wisner*

</div>

Dated: August 28, 2023

## Certificate of Service

I hereby certify that on August 28, 2023, I electronically filed the foregoing instrument with the Clerk of the Court using the ECF system, and that a copy was electronically served on all counsel of record via the ECF system and to any counsel not registered to receive electronic copies from the court, by enclosing same in a sealed envelope with first class postage fully prepaid, addressed to the above, and depositing said envelope and its contents in a receptacle for the U.S. Mail.

<div style="margin-left:40%">

By: *s/ Trent B. Collier*
Trent B. Collier (P66448)

</div>

Dated: August 28, 2023

## Certificate of Compliance

As required under LCivR 7.2(b)(i), I certify that this brief includes 9,144 words including headings, footnotes, citations and quotations and not including the case caption, cover sheets, any table of contents, any table of authorities, the signature block, exhibits, and affidavits. This word count was generated by Microsoft Word 2016, the processing software utilized to draft this motion and brief.

By: *s/ Trent B. Collier*
Trent B. Collier (P66448)

Dated: August 28, 2023